**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

DENNIS MURPHY, Guardian Ad Litem
For N.E.D., an incapacitated minor; JACOB DOTSON;
DOMINIQUE BILLY, individually and as next friend
of I.C. and S.D., minors,

       Plaintiffs,                           No. 17-cv-384 JAP/JHR

vs.

THE UNITED STATES OF AMERICA,

       Defendant.

**<u>PRETRIAL ORDER</u>**

    In accordance with Fed. R. Civ. P. 16, the Court enters this Final Pretrial Order:

**<u>I.  APPEARANCES</u>**

**Attorneys who will try this action:**

      For Plaintiffs:      Theodore W. Barudin
                               BARUDIN LAW FIRM, P.C.
                               7900 Menaul NE
                               Albuquerque, NM 87110
                               (505) 332-1800
                               tbarudin@barudinlaw.com

                               William H. Carpenter
                               WILLIAM H. CARPENTER LAW OFFICE
                               Post Office Box 35070
                               Albuquerque, NM  87176-5070
                               (505) 243-1336
                               bill@carpenter-law.com

                               Ronald I. Kaplan, MD, JD
                               KAPLAN & LUKOWSKI, LLP
                               333 Sandy Springs Circle
                               Suite 200
                               Atlanta, Georgia 30328
                               (404) 845-0012 (x202)
                               rik@kaplanlegal.com

      For Defendant:     Erin Langenwalter
                               United States Attorney's Office

District of New Mexico
P.O. Box 607
Albuquerque, NM 87103
505-346-7282
Erin.Langenwalter@usdoj.gov

Ruth Fuess Keegan
United States Attorney's Office
District of New Mexico
P.O. Box 607
Albuquerque, NM 87103
Ruth.f.keegan@usdoj.gov
505-346-7282

## II.  JURISDICTION AND RELIEF SOUGHT

**A.     Subject Matter Jurisdiction.**

      **1.      Was this action removed or transferred from another forum?** ___ Yes ___X___ No

      **2.      Is subject matter jurisdiction of this Court contested?**

  __X__ Uncontested _____ Contested _____ Party contesting

      **3.      Asserted basis for jurisdiction.**

  __X__ Federal Question _____ Diversity _____ Other

Statutory Provision(s) Invoked: _Federal Tort Claims Act, 28 U.S.C.  §§2671 *et. seq;*

New Mexico Medical Malpractice Act, NMSA, 1978 §§41-5-1 *et. seq.;* New Mexico substantive

and common law.

**B.     Personal Jurisdiction and Venue.**

      **1.      Is personal jurisdiction contested?**

  ____X____ Uncontested _____ Contested

      **2.      Is venue contested?**

  ____X____ Uncontested _____ Contested

**C.** **Are the proper parties before the Court?**

_____Uncontested    ___X____ Contested

This matter was contested but has been ruled on by the Court. *See* United States' Motion to Dismiss for Failure to Join Indispensable Parties or, Alternatively, to Force Joinder, May 25, 2018 (Doc. 99) and this Court's Memorandum Opinion and Order (130) DENYING the Motion.

**D.** **Identify the affirmative relief sought in this action.**

1. **Plaintiffs seek:**

   a. Findings by the Court that Defendant and its medical personnel were federal employees who were negligent and breached the standards of care for the medical care and treatment rendered to N.E.D. pursuant to 28 U.S.C. §450f(d), and that such negligence was the legal and proximate cause of Plaintiffs' damages;

   b. Findings that such negligence and damages are consistent with New Mexico law;

   c. Any and all allowable damages arising under the New Mexico Medical Malpractice Act, NMSA, 1978 Sections 41-5-1, *et. seq*., including without limitations, past, present, future medical bills, and all past, present and future medically related treatment and care;

   d. A determination that the New Mexico Malpractice act is unconstitutional.
   In the alternative, a determination that the New Mexico Malpractice act is unconstitutional as applied and interpreted.

   e. An award of attorney's fees @ 25% plus New Mexico Gross Receipts tax;

   f. An award of taxable costs;

   g. An award of pre- and post-judgment interest.

2. **Defendant seeks:**

   a. Judgment in favor of the United States with respect to all of Plaintiffs' claims;

   b. Dismissal of Plaintiffs' Complaint with prejudice.

### III. BRIEF DESCRIPTION OF NATURE OF CLAIMS/DEFENSES

**A.      Plaintiffs' claims against Defendant:**

1.      Failure to attempt less invasive efforts and/or medications to calm N.E.D. before resorting to more dangerous invasive methods;

2.      Unreasonably subjecting N.E.D. to the attendant risks of intubation that was unnecessary in the absence of a proper patient assessment.

3.      Failing to proceed with caution after making a hasty and erroneous decision to intubate with paralyzing drugs instead of using sedation drugs that did not deprive N.E.D. of the ability to breathe on her own.

4.      Failure to allow N.E.D.'s father, Jacob Dotson, to remain with her while she was in the emergency department sitting on a gurney in the Gallup Indian Medical Center;

5.      Use of unnecessarily dangerous paralyzing drugs in administering the endotracheal tube, known to eliminate the ability to independently breath when admittedly less dangerous drugs could have been used and were available that would not have prevented spontaneous unassisted breathing by the patient;

6.      Failure to follow the "gold standard" in not confirming that the endotracheal tube was in the proper location by use of a chest x-ray prior to any patient movement or transport out of the Emergency Department;

7.      Failure to utilize available contiguous waveform quantitative Capnography equipment to provide ongoing monitoring of the patient to alert the medical staff of any oxygen deprivation issues, also considered the current standard of care.  (2010 American Heart Association and Titinalli's Emergency Medicine Study Guide);

8.      Not properly securing the endotracheal tube to prevent it from becoming dislodged;

9. Not recognizing that a child with an endotracheal tube has a greater chance of having it dislodged when transporting, particularly in an emergency situation or if recognized, failure to treat the patient with the proper level of caution;

10. Failing to protect the patient by not proceeding with due caution to avoid displacing the tube - literally, the nurses on each side of the gurney were moving so aggressively as to pull the patient away from the respiratory therapist who was holding onto the bag attached to the endotracheal tube, all the while transporting her on a gurney to the CT Scan Room;

11. Failing to properly monitor the patient at all times so that remedial steps could be taken immediately upon any change in the heartbeat, oxygen saturation or other critical alerts that N.E.D. was not receiving oxygen;

12. The vital signs monitoring equipment was equipped with an alarm designed to alert the caregiver of an intubation failure that was either ignored, had been turned off or was inoperative resulting in a failure to alert the medical personnel of N.E.D.'s physiological crashing;

13. Failure to assure that N.E.D. had an adequate oxygen supply following intubation, during transport and while in the CT scan room;

14. Failure to have a second person in the CT scan room to physically observe and monitor the patient. Lead aprons are available to protect that person when monitoring is critical as in the case of a small pediatric patient with an endotracheal tube.

15. Failure of Defendant medical personnel to appreciate the severity of N.E.D.'s anoxic condition at the time of the transfer and failure to inform the University of New Mexico Hospital (UNMH) that N.E.D. had an anoxic brain condition and that such failure to inform the medical personnel at UNMH caused a delay in the treatment of N.E.D.'s condition;

16.     Unprofessional conduct on the part of Defendant's medical staff resulting in an ongoing "confrontation" or a "tiff" between an attending nurse and the respiratory therapist resulting in discontinuity of the vital monitoring of N.E.D.  This resulted in the abandonment of respiratory monitoring by the Respiratory Technician and failure of medical personnel to provide necessary monitoring until after it was recognized that the patient had sustained a cardiac arrest secondary to oxygen deprivation.

17.     Abandonment of the patient by the respiratory therapist who was the person best trained on airway management and charged with the responsibility of assuring the patient was receiving adequate oxygen. The respiratory therapist abandoned her duty after a "confrontation" with a contract nurse whose abilities to monitor and supply oxygen to a pediatric patient were unknown.

**B.    Defendant's defenses:**

Negligence is never presumed and may not be inferred merely from a lack of success or an adverse result from treatment. In this case, Dr. Waite and the medical staff at the Gallup Indian Medical Center acted at all times within the standard of care and Plaintiff's injuries were the result of a medical mishap, not medical malpractice.

Plaintiff's claim for damages is limited by the New Mexico Medical Malpractice Act, NMSA 1978, § 41-5-6(A) and the Federal Tort Claims Act, 28 U.S.C. § 2674.  To the extent Plaintiffs purport to assert a separate theory of liability than for Medical Negligence (Count I), those claims are beyond the scope of the United States' waiver of sovereign immunity. The Federal Tort Claims Act (FTCA) is a limited waiver of sovereign immunity, allowing the federal government to be sued for the actions of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States would be liable if

it were a private employer. See 28 U.S.C. § 1346(b) and 2674. In this case, Plaintiffs concurrently filed five administrative tort claims (one for each Plaintiff), and Plaintiffs' claims are limited to the acts of medical negligence alleged therein.

Plaintiffs bear the burden of establishing the essential elements of their claims. To rebut Plaintiffs' claim that the United States or its personnel failed to exercise due care and diligence at all times, the United States will rely on testimony of its employees and deemed employees, as set forth in their deposition testimony, and on the expert reports disclosed by Defendant.

To rebut Plaintiffs' claim that the United States was the sole proximate cause of Plaintiffs' injuries, the United States will rely on Plaintiffs' deposition testimony describing the events which occurred before N.E.D. was treated at GIMC, and on any allegations and admissions in Plaintiffs' companion case *Murphy, et al. v. PlayPower, et al*., D-1113-2018-CV-00011. Plaintiff N.E.D., under the supervision and direction of her aunt, was permitted to play in an area that Plaintiffs' could observe to be inadequately covered with safety material, on a piece of equipment that was observed to place N.E.D. at risk due to the distance between the apparatus, and the height. The United States will rely on Plaintiffs' deposition testimony describing the events which occurred before N.E.D. was treated at GIMC, and on any allegations and admissions in Plaintiffs' companion case *Murphy, et al. v. PlayPower, et al*., D-1113-2018-CV-00011.

To the extent Defendant is held liable, which is disputed, Plaintiffs recovery should be reduced to the extent Plaintiffs have failed to mitigate their damages. For example, Plaintiffs have failed to enroll N.E.D. in public school and as such, she is not receiving benefits to which she is entitled under the Individuals with Disabilities Education Act (IDEA), § 612, 20 U.S.C.A. § 1412(a)(1), which sets forth a substantive obligation to provide a disabled student with free appropriate public education (FAPE) as set forth in an individualized education program (IEP)

reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. To further rebut Plaintiffs' claims for damages, the United States rely on the testimony of its experts.

Under Plaintiffs' theory of the case, the Defendants in *Murphy, et al. v. PlayPower, et al.*, D-1113-2018-CV-00011 and the United States are successive tortfeasors, and the United States is responsible only for the enhancement of any injuries received during the initial incident.

In the event a judgment is awarded, a reversionary trust must be created. It is in the best interests of N.E.D. to ensure protection of funds for her future medical expense and is appropriate to mimic the New Mexico Medical Malpractice Act's periodic payment requirement, and remove the risk of double recovery against the United States which would otherwise result. *See Deasy v. United States*, 99 F.3d 354 (10th Cir. 1996); *Hill v. United States*, 81 F.3d 118 (10th Cir. 1996).

## IV. FACTUAL CONTENTIONS UNDERLYING CLAIMS/DEFENSES

**A.** **Stipulated Factual Contentions.**

The parties agree to the following facts listed separately below:

1. The Gallup Indian Medical Center is a federal hospital funded by the United States of America through the Department of Health and Human Services and the Indian Health Services;

2. N.E.D. was born on November 10, 2009 and was six years old at the time of the incident;

3. Steven Waite, M.D. was an employee of the Defendant and was the treating emergency room physician on February 28, 2016;

4. Ella Begay was an employee of the Defendant and was the treating respiratory therapist on February 28, 2016;

5. Ernest Sandoval was an employee of the Defendant and was a supervisory respiratory therapist on February 28, 2016;

6. Kelli Coggins Smith was a contract nurse employed by the Defendant on February 28, 2016 under a personal service contract, for which the United States assumes Federal Tort Claims Act liability;

7. Judy Romero, Pharm.D. was an employee of the Defendant on duty on February 28, 2016;

8. Richard Tyler was an employee of the Defendant and was the CT scan operator on February 28, 2016;

9. Dr. Philip McNeil was an employee of the defendant, and was an emergency room physician on duty on February 28, 2016 at the GIMC.

**B.** **Plaintiffs' Disputed Factual Contentions:**

1. On the afternoon of February 28, 2016, N.E.D. fell off playground equipment at the Indian Hills Playground in Gallup, N.M.

2. N.E.D.'s aunt, Danielle Billy, who was with N.E.D. at the playground, took N.E.D. to N.E.D.'s great grandmother's home following the fall.

3. At the time of the fall, N.E.D.'s mother, Dominique Billy, was a patient at the Gallup Indian Health Center, having just given birth.

4. Jacob Dotson, N.E.D.'s father, was with N.E.D.'s mother at the Gallup Indian Health Center at the time of the fall.

5. After the fall, Danielle Billy took N.E.D. to her grandmother's house and then to see her parents at the Gallup Indian Health Center ("GIMC").

6.      After a short visit with her mother at the hospital, Jacob Dotson brought N.E.D.

back to their home but when N.E.D. awoke from a nap crying, it was decided to bring her back

to the hospital to the emergency room.

7.      Dr. Waite first saw N.E.D. at 4:02 p.m.at the Gallup Indian Medical Center

Emergency Room.

8.      Based upon the history of a fall by this six-year-old and crying that the medical

staff could not console, it was decided that N.E.D. should have a head CT.

9.      Based on N.E.D.'s condition and history of a fall, performing a CT scan was

reasonable.

10.      The medical records reflect that, except for crying, the physical examination was

normal in all respects including normal breathing, oxygen levels, and normal neurological signs.

11.      Dr. Waite decided to paralyze and intubate N.E.D. for the apparent purpose of

rendering her motionless without respect to the fact her airway and breathing was normal.

12.      Defendant's employees determined that N.E.D. had a GCS (Glasgow Coma

Scale) of either 10 or 11 when first seen in the ED.

13.      Advanced Traumatic Life Support (ATLS) guidelines for intubation provide that

it should be performed with a GCS of 8 or less, airway obstruction, persistent hypoxia or

inadequate ventilation.

14.      N.E.D. did not have an airway obstruction, persistent hypoxia or inadequate

ventilation.

15.      There were viable options to calm N.E.D. in the emergency room sufficiently to

be able to perform a head CT without having to intubate N.E.D.

16.     Prior to intubating N.E.D. she was administered paralytic drugs, ordered by Dr. Waite, which prevented N.E.D. from breathing on her own.

17.     Dr. Waite intubated N.E.D. at 4:19 p.m.

18.     At 4:19 p.m. Dr. Waite intubated N.E.D. using a size 6.5 tube which was taped at 17 cm.

19.     The standard of care requires that immediately following intubation, a chest x-ray be taken to confirm the placement of the tube supplying oxygen to the patient.

20.     The Defendant had portable digital x-ray equipment available in near proximity to the Emergency Department and could have been at the bedside of NED if requested.

21.     The standard of care requires that all necessary measures to confirm proper placement of the endotracheal tube be taken.

22.     Proper intubation of a patient requires that a breathing tube be placed in in the trachea above the carina.

23.     An improperly placed breathing tube can seriously impair the patient's ability to get sufficient oxygen to sustain bodily functions.

24.     N.E.D. was adequately oxygenated before she was intubated, with a pulse ox of 98% on room air.

25.     The standard of care requires that a properly operating vital signs monitor with a functioning alarm system be attached to an intubated patient in order to confirm the patient's vital signs, including respirations, pulse oximetry and heartbeats.

26.     A monitor was attached to N.E.D., which was intended to track vital signs.

27.     The monitor included an alarm intended to alert the medical providers if the patient's vital signs were deteriorating.

28.     Either the monitor attached to N.E.D. did not sound an alarm, or the alarm was ignored when N.E.D.'s vital signs indicated she was experiencing life threating conditions.

29.     The standard of care requires that all medical personnel who accompany an intubated patient for a CT scan carefully monitor the patient to insure that the patient is properly oxygenated.

30.     No Defendant medical personnel admits to observing the monitor while N.E.D. was in the CT scan room.

31.     Dr. Waite did not order a chest x-ray following the intubation he performed at 4:19 p.m.

32.     Had an x-ray been performed immediately following the first intubation, the misplacement of the endotracheal tube would, more likely than not, have been recognized and the tube could have been re-placed.

33.     Capnography equipment, which measures "end tidal" carbon dioxide emitted by a patient, was available in the Emergency Room on February 28, 2016.

34.     Capnography equipment that was available would have provided continuous monitoring of the airway to assure adequate oxygen supply.

35.     Capnography is now considered the standard of care.

36.     Capnography equipment capable of ongoing monitoring was available to Dr. Waite and the Emergency Department staff.

37.     Capnography was not used to monitor N.E.D.'s carbon dioxide levels. The failure to monitor N.E.D.'s carbon dioxide levels after she was intubated constituted a breach of the standard of care.

38.     Had capnography equipment been utilized, more likely than not, N.E.D.'s injuries would have been avoided.

39.     Dr. Waite unnecessarily rushed N.E.D. to the CT scan room without performing required tests necessary to confirm the placement of the endotracheal tube and to insure that N.E.D. was being properly oxygenated.

40.     The standard of care required that N.E.D. be connected to an adequate oxygen supply at all times while intubated.

41.     For some or all of the time N.E.D. was in the CT scan room she was not connected to an oxygen supply.

42.     When Defendant's medical personnel were going to the CT scan room, Ella Begay, the respiratory therapist who had documented bad knees, could not keep up with her bagging requirements while transporting N.E.D., which contributed or caused the dislodgment of the endotracheal tube causing N.E.D. to be deprived oxygen.

43.     Defendant knew and had reason to know that Ella Begay had bad knees prior to February 28, 2016

44.     Ella Begay and Nurse Coggins had a confrontation ("tiff") regarding Ms. Begay's inability to keep up with the gurney while transporting N.E.D. to the CT scan room.

45.     After the conclusion of the CT scan, N.E.D. had an oxygenation level of 40%.

46.     After the conclusion of the CT scan N.E.D. did not have a heartbeat.

47.     After the conclusion of the CT scan, Kelli Coggins began CPR on N.E.D.

48.     After the conclusion of the CT scan, N.E.D. was taken back to the Emergency Department and seen by Dr. Waite.

49.     The CT of the head revealed no acute intracranial pathology prior to the events in the CT scan room.

50.     N.E.D. was non-responsive when seen by Dr. Waite following the CT scan.

51.     At 4:37 p.m. Dr. Waite extubated N.E.D. and then re-intubated her at a different level.

52.     When he re-intubated N.E.D. Dr. Waite used a size 6.0 tube that was taped at 16 cm.

53.     An x-ray taken following the 4:37 p.m. intubation showed "intubation of the right mainstream bronchus with probable atelectatic change right upper lobe," that over inflation of the right lung was possible.

54.     The x-ray report and the x-ray imaging are not consistent as to when the x-rays were taken. The x-ray reports indicate that the post arrest x-rays were taken beginning at 4:35 p.m. The time stamp on the x-ray file indicated that they were taken at 5;13 p.m. and 5:13 p.m. (19 minutes apart).

55.     The medical record reflects that upon N.E.D.'s return to the emergency room, x-rays were taken for the first time at 4:35 p.m. following extubation of the first tube and placement of a second endotracheal tube.  Upon placement of the second tube, it was determined that the original endotracheal tube was placed too long or placed too deep in the trachea.

54.     Based upon the 4:52 x-ray Dr. Waite adjusted the length of the endotracheal tube to 15.

55.     N.E.D. was deprived of adequate oxygen for an indeterminate time.

56.     Dr. Philip McNeil was the treating emergency room physician who authorized the transfer of N.E.D. from GIMC to UNMH at 5:26 p.m.

57.     As a result of being deprived of oxygen while intubated, N.E.D. suffered a devastating global brain injury.

58.     The failure to maintain an adequate oxygen supply was a breach of the standard of care.

59.     The failure to maintain an adequate oxygen supply proximately caused the anoxic brain injury sustained by N.E.D.

60.     The initial placement of the endotracheal tube at 17 contributed to the anoxic brain injury suffered by N.E.D.

61.     The anoxic brain injury suffered by N.E.D. was caused, in its entirety by the failure to keep N.E.D. properly oxygenated while she was intubated.

62.     N.E.D. suffered aspiration pneumonitis as a result of the improper placement of the intubation tube.

63.     Dr. Waite's breaches of the standard of care are a proximate cause of N.E.D.'s anoxic brain injury.

64.     The breaches of the standard of care by the Defendant's employees are a proximate cause of N.E.D.'s anoxic brain injury.

65.     The anoxic brain injury suffered by N.E.D. was proximately caused by the breaches of the standard of care by Dr. Waite and the medical staff of GIMC.

66.     The failure to provide N.E.D. with adequate oxygenation while she was intubated caused her to suffer an anoxic brain injury, significant cognitive and motor deficits, and autonomic dysfunction with storming.

67.     N.E.D. sustained a severe anoxic hypoxic brain injury resulting in severe neurological impairments that are permanent, including inability to speak, cognitive

impairment/mental retardation, ADHD/learning disabilities, emotional/behavioral issues, cerebral palsy/movement disorders, spasticity, visual and/or hearing impairments, feeding and growth issues, decreased ability to learn or be employed meaningfully and increased pain and suffering and potential for epilepsy seizures.

68.     N.E.D. was transported by helicopter to the University of New Mexico Hospital ("UNMH"), arriving at 6:45 pm.

69.     MRIs taken at UNMH confirmed that N.E.D. suffered severe hypoxic brain injury as a result of the failure of the medical staff at GIMC to properly care for and monitor N.E.D.

70.     The August 3, 2016 discharge summary from University of New Mexico Hospital (UNMH) confirmed the diagnosis of anoxic brain injury with significant cognitive and motor deficits, dysphagia, gastroesophageal reflux, and complex care coordination.

71.     N.E.D. will never be able to live on her own.

72.     N.E.D. is incapable of becoming employed in the future.

73.     N.E.D will require close and consistent daily supervision by qualified personnel for the remainder of her life.

74.     In addition to qualified outside services, the mother and/or father, Plaintiffs Dominique Billy and Jacob Dotson, needs to be present to supervise, render emotional support and assist other caregivers on a constant basis.

75.     N.E.D.'s life expectancy is unaffected by her injuries.

76.     N.E.D. has a life expectancy of 75 years.

77.     N.E.D.'s medical bills are $$627,126.50 as of the date of this Pretrial Order and are ongoing and continuing.

**C**.     **Defendant's Disputed Factual Contentions**:

Defendant will submit its findings of fact as ordered by the Court. Generally, however, the Government contends as follows:

1.      On February 28, 2016 N.E.D. was brought to the emergency room at GIMC by her father. He burst into the emergency room suite, and reported that N.E.D. had fallen from a piece of playground equipment 20 feet onto concrete or brick. After N.E.D. was taken home, she fell asleep then awoke shortly thereafter screaming hysterically.

2.      The Emergency Room doctor, Dr. Waite, appropriately determined that rapid sequence intubation was warranted due to altered mental status and that a dose of lorazepam was given at 16:13, followed by succinylcholine and ketamine at 16:16 to induce anesthesia to enable intubation. The records further document that intubation was successful.

3.      Correct placement of the endotracheal tube was confirmed by auscultation showing no breath sounds over the epigastric area, positive breath sounds bilaterally, and a color change to yellow indicating that carbon dioxide was being ventilated from N.E.D.'s lungs. None of the ventilators available at GIMC in 2016 were capable of a continuous printout of N.E.D.'s CO2.

4.      N.E.D. was transported to the CT scanner for an evaluation of her head trauma by Respiratory Therapist Ella Begay and RN Kelli Coggins Smith. During the scan, N.E.D.'s heart rate dropped to 45 with absent pulses. CPR was initiated immediately and N.E.D. was transferred back to the emergency room. Dr. Waite documented that he extubated and bagged N.E.D. and that her pulse returned in the 140s with blood pressure greater than 100 systolic. The second intubation of N.E.D. was successful - an x-ray showed the endotracheal tube had been advanced into the right main stem bronchus, which was consistent with auscultation showing breath sounds on the right greater than on the left. The endotracheal tube was withdrawn one centimeter and a x-

ray showed that the endotracheal tube was in the trachea at the T2 level and left upper lobe atelectatic change or consolidation, consistent with pneumonia.

5.     Plans were made to transfer N.E.D. to the service of Dr. Agarwal at the University of New Mexico Hospital (UNMH), and within a half hour, Gallup Med Flight personnel were in the emergency room.  N.E.D. was transferred to UNMH without incident and transferred to the pediatric intensive care unit.

6.     Upon assessment, the UNMH noted that N.E.D. had suffered a closed head injury and altered mental status after a fall. An initial MRI was read as normal, but over the next few days repeat radiology showed signs consistent with severe hypoxic brain injury.

## V.  APPLICABLE LAW

**A.     Do the parties agree which law controls the action?**

      X     Yes  _____ No

**If yes, identify the applicable law:**

Federal Tort Claims Act, 28 USC § 2671 *et. seq.;*

New Mexico is the law of the place thereby looking to New Mexico substantive and common law, 28 U.S.C. §1346(b);

New Mexico tort law, common law, and the New Mexico Medical Malpractice Act; and

Federal Rules of Civil Procedure and Rules of Evidence.

**If no, identify the dispute and set forth each party's position regarding the applicable law.**

N/A, subject to the contested issues of law, set forth below.

# VI. CONTESTED ISSUES OF LAW

**Identify the specific issues of law that are contested.**

1.     **Plaintiffs' Contentions –**

   a. Defendant's breaches of the standards of care to a reasonable medical certainty proximately caused Plaintiffs' injuries and damages;

   b. Full damages including pain and suffering, loss of income and income opportunity, loss of enjoyment of life, and any other damages allowed under New Mexico common law;

   c. The amount and nature of past benefits which are medically related;

   d. The amount and nature of medical and related benefits which are medically related;

   e. Dominique Billy is to be compensated for past, present, and future caregiving to NED at an hourly rate commensurate with a professional provider; *Shadbolt v. Schneider, Inc.,* 710 P.2d 738,742 (N.M. App. 1985), *St. Clair v. County of Grant,* 797 P.2d 993, 998 (N.M. App. 1990); *Hill v USA*, 81 F.3d 118 (10th Cir. 1996);

   f. The statutory cap of $600,000 in the New Mexico Medical Malpractice Act, NMSA 1978, §41-5-6(A) is unconstitutional;

   g. Plaintiff further contends that the New Mexico Malpractice Act is unconstitutional *as applied* in the context of the Federal Tort Claims Act in that it does not provide for a fund to address further needs and contingencies should a change occur in condition or need for medical care;

   h. Plaintiff further contends that the New Mexico Malpractice Act is unconstitutional *as applied* in the context of the Federal Tort Claims Act in that it does not provide for all damages allowed under the New Mexico Medical Malpractice Act including (1) provision for a fund that would address any future contingencies, (2) no impositions or restrictions on any trust created for the protection of the child, (3) the New Mexico Medical Malpractice Act allows for punitive damages which allows for complete damages in the more egregious cases;

   i. The Defendant is not entitled to indemnification for any payments made by the state defendants in *Murphy v. City of Gallup, et. al.*, McKinley County, D-1113-CV-2018-00011;

    j.    The Defendant will not be bound by a jury verdict in *Murphy v. City of Gallup, et. al.*, McKinley County, D-1113-CV-2018-00011;

    k.    A reversionary trust is unnecessary, is not in the best interests of N.E.D, and should not be required;

    i.    Defendant is vicariously liable for the acts and failures to act of its medical personnel at the Gallup Indian Medical Center;

    j.    Defendant knew and had reason to know that Ella Begay had bad knees prior to the incident of February 28, 2016 and failed to ensure that she would be able to maintain her mobility in an emergent event requiring the maintenance of N.E.D.'s airway;

    k.    Defendant knew of the physical requirements for a respiratory therapist pursuant to the Indian Health Services Manual and knew and had reason to know that Ella Begay did not meet such physical requirements, thereby violating a requirement, policy, and directive of the Department of Health and Human Services/Indian Health Services in the physical requirements of a respiratory therapist;

    l.    Ella Begay did not know how to use the capnography equipment at GIMC on February 28, 2016.

## 2.    Defendant's Contentions –

Defendant disputes all of Plaintiffs contested issues of law. Defendant will set forth its specific conclusions of law in its proposed Findings of Fact and Conclusions of Law as ordered by the Court. Generally, however, the Government contends as follows:

    a.    The Federal Tort Claims Act (FTCA) is a limited waiver of sovereign immunity, allowing the federal government to be sued for the actions of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States would be liable if it were a private employer. *See* 28 U.S.C. § 1346(b) and 2674.

    b.    Under the FTCA, the United States is responsible to injured persons for the common law torts of its employees in the same manner in which the common law historically has recognized vicarious liability. To that end, the Tenth Circuit supports the view that the FTCA itself constitutes respondeat superior liability. *Haceesa v. United States*, 309 F.3d 722, 729 (10th Cir. 2002). There is no separate or additional cause of action for which the United States has waived its sovereign immunity.

    c.    Plaintiffs' First Amended Complaint sets forth a separate cause of action for negligent training and supervision (Count IV). Plaintiffs' claims for negligent training and supervision fall under the discretionary function exception to the waiver of sovereign

immunity under the FTCA and therefore are barred. *See Richman v. Straley et al.*, 48 F. 3d 1139, 1146 (10th Cir. 1995); *Sydnes v. United States*, 523 F.3d 1179, 1185 (10th Cir. 2008); *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995)("[i]ssues of employee supervision and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception") (citations omitted).

d. The administrative claim was insufficient to put the United States on notice of their claims for negligent supervision and hiring. *See Bethel v. U.S., ex rel. Veterans Admin. Med. Ctr. of Denver, Colorado, 495 F.Supp.2d at 1124 (holding that plaintiff's treatment-based claim, whic*h focused on medical malpractice, was insufficient notice of subsequent negligent supervision argument).

e. Plaintiff properly stipulated to dismissal of Count IV for negligent training and supervision. (Doc. 105).

f. In this case, Plaintiffs filed five administrative tort claims:

   1. 2016-0622, filed September 13, 2016, for $32,000,000.00 on behalf of N.E.D. (Dominique Billy and Jacob Dotson as parents and guardians of…);

   2. 2016-0623, filed September 13, 2016, for $5,000,000.00 on behalf of Sebastian Dotson (Dominique Billy and Jacob Dotson parents and guardians of…);

   3. 2016-0624, filed September 13, 2016, for $5,000,000.00 on behalf of Isaiah Chavez (Dominique Billy as parent and guardian of…);

   4. 2016-0625, filed September 13, 2016, for $20,000,000.00 on behalf of Dominique Billy; and

   5. 2016-0626, filed September 13, 2016, for $20,000,000.00 on behalf of Jacob Dotson.

g. In each administrative claim, Plaintiffs set forth a summary of events and allege the following acts of medical negligence. Plaintiff's claims for negligence are limited to these items 1-9:

   1. Incomplete and inconsistent medical records;

   2. Incomplete evaluation or neurological assessment to justify paralytics to obtain CT;

   3. Glasgow Coma Scale did not indicate need for emergent intubation;

4. Failure to use less dangerous drugs to calm or sedate Natalie;

5. Proceeding to intubation before less dangerous methods were attempted;

6. Improper intubation;

7. Failure to secure the intubation tube;

8. Failure to properly monitor Natalie's condition while she was intubated; and

9. No x-ray was initially performed to confirm placement, which was probably her stomach not lungs.

h. Plaintiff stipulated to dismissal of the siblings I.C. and S.D.'s claims for loss of consortium. (Doc. 105).

i. Although Plaintiffs' administrative claims mention in passing the "negligent supervision of doctor and nurse personnel," here, while Plaintiffs may have adequately alleged medical negligence of the Gallup Indian Medical Center, they have offered no additional facts to explain why, because there was negligence, there must have been negligent supervision or training. There can be medical negligence without negligent supervision and training, so Plaintiffs cannot simply repeat the alleged acts of medical negligence to support their claim. Without more, the allegations that the Complaint sets forth are conclusory and speculative. Begay v. United States, 188 F. Supp. 3d 1047, 1095 (D.N.M. 2016). Since Plaintiffs' SF-95 offered no facts specific to their claims for negligent supervision and training, their notice of claim was insufficient and they have failed to exhaust their claims. Id.

j. This court lacks subject matter jurisdiction over any claims which were not the subject of an administrative claim timely and properly presented pursuant to 28 U.S.C. § 2675(a). For the same reasons described above in re: negligent supervision and training, Plaintiffs failed to adequately describe their claims for "Institutional negligence," "Breach of warranty," and "Negligence per se" in their SF-95 claim forms, or for any claims not otherwise included. Therefore, in the event Plaintiffs assert additional claims, of which the United States is not currently aware, they are barred.

k. If the United States is liable, which is specifically denied, Plaintiffs are limited to $600,000 in past economic and non-economic damages, to include loss of consortium, pursuant to NMSA § 41-5-6. Under § 41-5-6(A) "[e]xcept for punitive damages and medical care and related benefits, the aggregate dollar amount recoverable by all persons for or arising from any injury or death to a patient as a result of malpractice shall not exceed six hundred thousand dollars ($600,000) per occurrence." In other

words, medical malpractice claims in New Mexico are capped at $600,000.00 except for recovery of medical care and related benefits.

l.  In cases against the United States, nurses and health care administrators are "health care providers" within the meaning of the recovery cap statute. *See Haceesa v. United States*, 309 F.3d 722, 728 (10th Cir. 2002).

m.  The Tenth Circuit has held that the state-law cap on damage awards applies to the United States to the same extent as it applies to private persons. *See Haceesa v. United States*, 309 F. 3d 722 (10th Cir. 2002), cert. den. 540 U.S. 814 (2003). Therefore, the New Mexico Medical Malpractice Act cap applies to limit damages against the United States. *See id.*

n.  Under Plaintiffs' theory of the case, the Defendants in *Murphy, et al. v. PlayPower, et al.*, D-1113-2018-CV-00011 and the United States are successive tortfeasors. As such, under Fed. R. Civ. 12(b)(7), 12(c), 12(h)(2), and 19, dismissal of this action is warranted because Powerplay, Inc., Miracle Recreational Equipment Co., Churchich Recreation Equipment, LLC and the City of Gallup are indispensable parties and this Court does not have subject matter jurisdiction over claims against the City of Gallup. Alternatively, the defendants in the state court action are required parties and should be joined in this action.

o.  Negligence is never presumed and may not be inferred merely from a lack of success or an adverse result from treatment.

p.  In the event of liability, the burden rests upon the plaintiff to establish by sufficient evidence a factual basis for the amount of damages sought and the reasonable certainty of future medical expenses or damages.

q.  In the event of liability, a plaintiff may only recover for reasonable household and personal services and may not also claim an additional recovery for the loss of income. *See e.g., Rios v. Bigler*, 847 F. Supp. 1538, 1547–48 (D. Kan. 1994), *aff'd, Rios v. Bigler*, 67 F.3d 1543 (10th Cir. 1995). *See also Jackson v. United States*, 526 F.Supp. 1149, 1154 (E.D.Ark.1981) (plaintiff could recover for caretaking expense in home, but could not recover for the loss of wife's salary), *aff'd*, 696 F.2d 999 (8th Cir.1982); *Byrne v. Pilgrim Medical Group, Inc.,* 187 N.J.Super. 386, 454 A.2d 920, 922 (1982).

r.  In the event a judgment is awarded, a reversionary trust must be created. It is in the best interests of N.E.D. to ensure protection of funds for her future medical expenses and is appropriate to mimic the New Mexico Medical Malpractice Act's periodic payment requirement and remove the risk of double recovery against the United States that would otherwise result. *See Deasy v. United States*, 99 F.3d 354 (10th Cir. 1996); *Hill v. United States*, 81 F.3d 118 (10th Cir. 1996).

s.  Guardian Ad Litem Fees should be included in the limitation on attorney's fees of 25% of the total recovery.

t.   An award of prejudgment interest is not permitted the Federal Tort Claims Act.

## VII.  MOTIONS

**A.     Pending Motions/Matters (indicate the date filed):**

- Parties' Briefing Regarding the Establishment of a Reversionary Trust (Docs.

  156, 159, 162, and 163). Simultaneous briefing was filed on March 8, 2019.

  Responses were filed on March 29, 2019.

**B.     Motions which may be filed:**

1.     Plaintiffs:

     a.     Trial briefs;
     b.     Motion for Directed Verdict

2.     Defendant:

     a.     Trial briefs;
     b.     Motion for judgment as a matter of law.

This Court's February 14, 2019 Order (Doc. 148) amended certain pretrial deadlines after the stay in proceedings due to the federal lapse in appropriations was lifted.  The Order established a deadline of March 8, 2019 to file motions in limine and any motions to exclude experts. Responses were due on March 29, 2019.  These dates have passed, and the Court will not accept additional motions in limine or any motions to exclude experts.

## VIII.  DISCOVERY

**A.     Has discovery been completed?  __X__ Yes   ____No.**

All discovery deadlines and any relevant extensions to those deadlines have now passed. No further discovery will be allowed.

**B.     Are there any discovery matters of which the Court should be aware? No.**

# IX. ANTICIPATED WITNESSES

*Each party is under a continuing duty to supplement this list and the description of anticipated testimony. This does not, however, apply to a rebuttal witness. Indicate if the witness will testify in person or by deposition and include a brief description of the anticipated testimony. If the testimony is by deposition, identify the deposition testimony by page number and line number. A witness who has not been identified and whose testimony has not been disclosed may not testify at trial unless good cause is shown.*

**A.**     **Plaintiffs' Witnesses:**

    **1.**     **Plaintiffs will call or have available at trial the following witnesses:**

**LIABILITY WITNESSES:**

    a.    <u>DENNIS MURPHY</u>, Guardian Ad Litem. (Estimated direct 15 minutes- Live). Mr. Murphy will testify to his role as the Guardian Ad Litem (Mr. Murphy has not been deposed). Mr. Murphy will appear live at trial unless excused by the court.

    b.    <u>DANIELLE BILLY</u>. (Estimated 1.5 Hours Total - Live). Ms. Billy is the aunt of N.E.D. and will testify consistent with her deposition.

       a.    Danielle will describe N.E.D. in the years leading up to the injury and the night before as a smart, healthy, vivacious six-year old.

       b.    She may identify some of the photographs of N.E.D. prior to and subsequent to N.E.D.'s injury on February 28, 2016.

       c.    Ms. Billy will testify that she was caring for N.E.D. the day of her injury because N.E.D.'s mother was in the hospital at Gallup Indian Medical Center delivering her baby son S.D.

       d.    She was standing close by a piece of playground equipment as N.E.D. was attempting to slide down the device which consisted of two parallel bars sloped similar to a regular slide.

       e.    N.E.D. was descending the slide holding on with her legs and hands as she had done on previous occasions.

       f.    Danielle had stepped back briefly to take a photograph of N.E.D.

       g.    N.E.D. fell backwards in a pendulum motion striking the ground head first.

       h.    N.E.D. had splinters in her face and was crying.

    i. N.E.D. was first taken to her great-grandmother's house and then to the hospital to see her mother and father by Ms. Billy.

    j. She can describe N.E.D.'s condition after she was discharged from UNMH and the difficulties in caring for her at this time because of the nature of her injuries.

    k. She will identify photos of the playground equipment that was involved in the fall

c. <u>JACOB DOTSON</u>.  (Estimated direct 60 minutes; 1.5 hours total - Live). Mr. Dotson is the natural father of N.E.D. and is the partner of Dominique Billy. Mr. Dotson will testify consistent with his deposition and will address the nature of his daughter's injuries, her daily condition, his role as the past, present, and future caregiver to N.E.D; the medical care received at GIMC, UNMH, and the Carrie Tingley Children's Hospital; future care and treatment of N.E.D., including home care and placement of N.E.D with specialized full time care; and the impact that N.E.D.'s injuries has had on their family;

    a. Mr. Dotson will testify that after Danielle Billy brought N.E.D. to GIMC, he took her home.

    b. N.E.D. lay down on the couch while he went to get her a Tylenol.

    c. When he returned, she as asleep.

    d. When N.E.D. awoke, she was crying and complaining that her head hurt.

    e. Mr. Dotson was concerned that N.E.D. continued to complain of her head hurting and decided to take her to the hospital emergency room at Gallup Indian Medical Center.

    f. Mr. Dotson will describe N.E.D.'s severe reaction when the emergency room nurse Kelly Coggins took her away from him - the intensity of her crying increased to the point of hysteria and she became inconsolable.

    g. Nurse Coggins and others started IVs and examined N.E.D.

    h. Dr. Waite then came and before he examined her said that she needed a CT and he was going to paralyze and intubate her.

    i. N.E.D. was then taken away and Mr. Dotson was not allowed in the area where the procedure occurred.

    j. When N.E.D. was returned from CT she was unresponsive.

k.  Richard Tyler, the CT tech, came running in saying that the CT was negative for any objective findings.

l.  Dr. Waite was visibly upset.

m.  Mr. Dotson will describe his feelings and what transpired as N.E.D.'s mother came to the Emergency room and the decision was made to take her to the UNM Hospital.

n.  Mr. Dotson may review some of the video taken of N.E.D. before and following her injury on February 28, 2016.

In the damages portion of the case, (Estimated direct for damages 60 minutes) Mr. Dotson will describe how N.E.D.'s injuries have impacted him and his observations of the burden on N.E.D.'s mother and others in caring for N.E.D. He will testify as to the needs of the family as far a place to care for her and accommodations for outside caregivers. He will also describe the impact this has had on N.E.D.'s mother and himself as well as the whole family.

d.  <u>DOLORES GONZALES, RN.</u> (Estimated direct 90 minutes; 2 hours total – Live).

a.  Ms. Gonzales has not been deposed.

b.  Ms. Gonzales was an emergency room nurse employed at the Gallup Indian Medical Center on February 28, 2016.

c.  Ms. Gonzales has first-hand knowledge of many of the events that transpired in the emergency department while N.E.D. was a patient.

d.  Ms. Gonzales was the person that wrote the entries in the medical record, reporting what she was told by Nurse Coggins and Dr. Waite.

e.  Ms. Gonzales will explain that Dr. Waite did not do an x-ray following the initial intubation procedure.

f.  Ms. Gonzales will confirm that the respiratory therapist did not utilize the available continuous wave form capnography for use in confirming placement of the endotracheal tube and for continuous monitoring of oxygen perfusion of oxygen to N.E.D.

g.  Ms. Gonzales will explain that in addition to the digital x-ray equipment being close by and readily available, which would give an image very quickly, the hospital had continuous waveform quantitative capnography equipment which would confirm placement (or misplacement) of the tube and would also provide ongoing assistance in monitoring.

h. Ms. Gonzales will testify that N.E.D. was attached to a standard monitor to keep track of her breathing, respirations, and oxygen, but that did not provide the information that the continues waveform capnography would have given.

i. The monitor that was used has a loud audible alarm if the patient's condition becomes unstable, however that alarm can be turned off.

j. Ms. Gonzales will describe her impressions of what transpired in the Emergency Room and the rendering of care to N.E.D.

k. Ms. Gonzales may identify photographs of the GIMC ER area and the path to the CT scanner.

e. <u>STEPHEN WAITE, M.D.</u> (Estimated total time 3 hours - Live):

1) Dr. Waite is not board certified as an emergency room physician;

2) Dr. Waite has received no special training in the care of a pediatric patient;

3) Dr. Waite belongs to no professional organization(s);

4) Dr. Waite is not certified in PALS;

5) Dr. Waite recognizes the textbooks by Rosen, Titinalli and UpToDate as authoritative sources;

6) Dr. Waite subscribes and reviews the Journal of the American College of Emergency Room Physicians. He subscribes to no other medical journals;

7) Prior to going to work for the Indian Health Service, Dr. Waite was licensed in the State of Ohio.

8) In 2006, his Ohio medical license was revoked by the State of Ohio because, according to Dr. Waite, they felt he was not practicing safe medicine. The Indian Health Service was advised of this action.

9) Dr. Waite will confirm that the findings on initial physical examination of N.E.D. were normal (clear lungs, adequate oxygen, normal neurological signs including no abnormalities of neck, nose, respiration was normal, not hypoxic, pupils were equal and normal, chest was normal, heart rate was normal, lungs were clear, and no reported loss of consciousness) with the exception of N.E.D. screaming hysterically, she was well developed and well nourished.

10) Dr. Waite admits that N.E.D. was not unstable and not in shock;

11) Dr. Waite will acknowledge that the basis of his decision for the need for a CT scan was N.E.D.'s inconsolable crying and not that she was having trouble breathing (she had an oxygen saturation at room air of 98%);

12) Dr. Waite admits that confirmation of the correct placement of the endotracheal tube by an x-ray is the standard of care;

13) Dr. Waite admits that he always obtains a chest x-ray in every case to confirm placement of the endotracheal tube;

14) Dr. Waite admits that no x-ray was taken following the first intubation prior to N.E.D. being taken to the CT room.

15) Dr. Waite will acknowledge that no continuous capnography was attached to N.E.D. for monitoring purposes;

16) Dr. Waite called for the respiratory tech to care for the breathing issues for N.E.D.;

17) Dr. Waite will acknowledge that he made the decision to administer a paralyzing drug as part of the intubation procedure which rendered N.E.D. incapable of breathing on her own making her totally reliant on medical staff for her breathing and supply of oxygen;

18) Dr. Waite will acknowledge that other drugs that would not have paralyzed (conscious sedation) N.E.D. were available had he chosen to use them;

19) Dr. Waite acknowledges the probable cause of N.E.D.'s cardiac arrest was that "he was concerned" the tube became dislodged resulting in hypoxic damage after the patient left the Emergency Room and before she returned after the CT had been done;

20) Dr. Waite will testify that when N.E.D. was returned from CT, the tube was not in the same position as when she was sent for CT and he was concerned that the tube had become dislodged.

21) Dr. Waite did not obtain an x-ray to determine the placement of the tube after the CT scan, but proceeded to remove the tube and attempt replacement;

22) Following the reinsertion of the tube, a series of x-rays were taken which indicated the tube was misplaced.

23) Dr. Waite had to correct the placement of the tube.

24) Before N.E.D. was transferred to UNMH, Dr. Waite was aware that the CT scan was normal and that the probable cause of her condition was an hypoxic episode that deprived N.E.D. of an adequate oxygen supply to the brain;

25) Dr. Waite admits that the cause of pediatric bradyarrhythmias are "largely the result of poor oxygenation – well – known".

26) That information was not put in the records nor conveyed to UNMH where N.E.D. was transferred.

f.  ELLA BEGAY. (Estimated total time 1.5 hours). Will testify by deposition designations, or as an adverse witness. On April 30, 2019 at the Pretrial Conference, the Court ruled on deposition designations, counter-designations and objections. Ms. Begay will testify that:

a.  She has been a certified respiratory technician for the last 28 years.

b.  She has worked at the GIMC since April, 1993.

c.  After insertion of an endotracheal tube, the standard of care is to confirm the proper location by chest x-ray.

d.  No x-ray was taken after the first intubation to confirm that the endotracheal tube was placed properly.

e.  Ms. Begay is not aware that the hospital had continuous end tidal capnography equipment available.

f.  Ms. Begay does not know what capnography is.

g.  Ms. Begay is not aware of any protocols at GIMC for proper assessment prior to intubation.

h.  She will describe the transfer/moving of N.E.D. from the Emergency Room to the CT scan.

i.  She will testify that Nurse Coggins and another nurse were running with the cart as she was attempting to bag or breath for N.E.D. during that transition.

j.  The nurses were moving so fast, Ms. Begay had difficulty keeping up with the cart.

k.  She had a hard time keeping up because she has bad knees and the nurse refused to slow down.

l.  At the time they arrived at the CT scanner she and Nurse Coggins had what Ella Begay describes as a "confrontation" about the way Nurse Coggins had been moving too fast.

m.  As a result of that confrontation, Ms. Begay turned the bagging or breathing over to Nurse Coggins and went behind the glass in the CT Scan room.

n.  Ms. Begay testified that the monitor recording vital functions was facing toward Nurse Coggins and not in Ella Begay's direction so that the patient was totally relying on Nurse Coggins for her breathing and monitoring of her condition.

o.  During this process Nurse Coggins was visiting or talking to the CT tech.

p.  After the CT scan she went into the room and when she reached a point when she could see the monitor, she discovered the monitor showed that N.E.D.'s oxygen saturation had dropped to 40 whereupon she stopped breathing.

q.  Ms. Begay did not hear an alarm sound on the monitor.

r.  Ms. Begay was interviewed by Ernest Sandoval after the N.E.D. incident who discussed the confrontation with her and Nurse Coggins.

g.  <u>KELLI COGGINS, RN.</u> (Estimated total time 2 hours) Testify by deposition designations, or as an adverse witness. On April 30, 2019 at the Pretrial Conference, the Court ruled on deposition designations, counter-designations and objections

a.  Nurse Coggins is a contract nurse.

b.  She has not yet received her bachelor degree in nursing;

c.  Ms. Coggins disputes what Ella Begay testifies occurred at the CT scan room.

d.  Coggins participated in the initial patient assessment of N.E.D. prior to the decision to intubate.

e.  Based upon her assessment N.E.D. had a normal temperature, pulse of 147, breathing 40 per minute, awake and alert, talking, breathing was spontaneous, normal circulation, eye opening was spontaneous, she withdrew from pain. N.E.D.'s head, ears, nose, mouth and neck, chest abdomen, pelvis, extremities and back were all within normal limits.

f.   She reports N.E.D. was agitated and restless and says that N.E.D.'s crying was inconsolable.

g.   When Dr. Waite announced that he was going to intubate N.E.D. she questioned that decision but accepted his explanation.

h.   GIMC had continuous end tidal capnography equipment, but it was not used in this case.

i.   She describes the trip to the CT scanner and acknowledges that when they arrived, she and Ella Begay had what she describes as a "tiff" similar to the confrontation language used by Ella Begay.

j.   She acknowledges that Ms. Begay complained that they were going too fast and she responded that Ella Begay was too slow.

k.   At that point, she took over the bagging or breathing for N.E.D. during the CT scan.

l.   She disputes the position of the monitor and will testify it was facing the direction of the glass where Ella Begay was sitting.

m.   She says that at the end of the CT procedure it was the other nurse (Bonnie Simon) that alerted her that the vital signs were failing;

n.   When N.E.D. went into full cardiac arrest, Coggins resuscitated her before returning to the emergency room.

o.   At the completion of the CT when N.E.D. was being transferred from the CT table to the gurney she discovered that the connection of oxygen to the oxygen supply in the CT room was not connected.

h.   **RICHARD TYLER**. (Estimated time 15 minutes) Testify by deposition designations, or as an adverse witness. On April 30, 2019 at the Pretrial Conference, the Court ruled on deposition designations, counter-designations and objections, limiting Mr. Tyler's testimony by deposition.

a.   Mr. Tyler will testify that if the monitor alarm had been on, was working properly and sounded, it would have been loud enough to hear behind the glass in the CT control room.

b.   He also believes that it was Ella Begay that alerted the room that N.E.D. was crashing after the CT had been completed and Ella Begay came back into the area where N.E.D. was lying.

i.   **ERNEST SANDOVAL**: (Estimated time 45 minutes). Testify by deposition designations, or as an adverse witness. On April 30, 2019 at the Pretrial

Conference, the Court ruled on deposition designations, counter-designations and objections, limiting Mr. Sandoval's testimony by deposition.

   a.  Mr. Sandoval is a respiratory therapist and was the supervisor of Ella Begay.

   b.  Mr. Sandoval confirms that x-ray confirmation of endotracheal tube placement is the standard of care.

   c.  Mr. Sandoval also confirms that GIMC had continuous capnography equipment available.

   d.  Mr. Sandoval describes standard procedure in intubation as including x-ray confirmation and use of continuous end tidal capnography for purposes of monitoring the patient.

   e.  Mr. Sandoval recalls being made aware that Ella Begay and Kelli Smith Coggins had a "tiff" as N.E.D. was being transferred to the CT room and that Ms. Begay was upset about that.

j.  <u>PHILIP MACNEIL, M.D.</u>  (Estimated time 15 minutes). Testify by deposition designations or as an adverse witness. On April 30, 2019 at the Pretrial Conference, the Court ruled on deposition designations, counter-designations and objections, limiting Dr. Macneil's testimony by deposition.

   a.  Dr. MacNeil is a medical doctor employed by Gallup Indian Medical Center.

   b.  Dr. MacNeil had a conversation with Ella Begay and Nurse Coggins about the transfer of the N.E.D. to the CT Scan room.

   c.  Ms. Begay related to him that she was concerned about her interaction with Nurse Coggins and felt that Nurse Coggins was mean to her.

   d.  Ms. Begay felt the nurse was going too fast and Nurse Coggins felt it was important to move the patient quickly.

   e.  Dr. MacNeil understood Ella Begay was responsible for the airway.

   f.  The standard in transporting is to go feet first - nobody every goes head first bagging.

   g.  Dr. MacNeil understood that Ella Begay need to go at a slower rate in terms of the velocity of the bed to CT – she was not capable of going faster than they actually went and it seemed to her there was an attempt to try and go faster.

   h. Dr. MacNeil also spoke to Judy Romero, the pharmacist, who told him that she saw the tube get dislodged.

 k. <u>JUDY ROMERO, Ph.D.</u> (Estimated time 15 minutes). Testify by deposition designations, or as an adverse witness. On May 3, 2019, the Court issued an Order (Doc. 175) ruling on the deposition designations, counter-designations and objections for Dr. Romero's deposition testimony.

   a. Dr. Romero is a pharmacist at GIMC;

   b. Dr. Romero participated in the care of N.E.D;

   c. Dr. Romero provided the medications as ordered to the nurse;

   d. Dr. Romero observed N.E.D. when she was initially in the Emergency Room because she heard her crying, "sort of screaming, going in and out of loudly crying to kind of whimpering";

   e. Dr. Romero has participated in intubations in children and if a child is having troubles breathing, intubation is an option.

   f. Dr. Romero was particularly concerned about N.E.D. because she was all alone and her parents were not with her.

 l. <u>ALEX SCHERMER, M.D.</u> (Estimated total time 3.5 Hours – Live). Dr. Schermer is a disclosed expert witness [Doc. 53] specializing in emergency room medicine who will testify consistent with his expert witness report of January 8, 2018 and any new and relevant information in formulating his medical expert opinions. Defendant did not depose Dr. Schermer. Dr. Schermer will testify live at trial. Dr. Schermer will testify as to the information he reviewed including the medical records, deposition testimony, authoritative publications including the Advanced Trauma Life Support (ATLS) guidelines of the American Heart Association.

   a. Dr. Schermer agrees with Dr. Waite that the recognized authorities included Rosen's Textbook on Emergency Medicine, Tintinallis Emergency Medicine, publications by the American College of Emergency Physicians as well as others.

   b. Dr. Shermer also agrees with Dr. Waite that UptoDate is a medical service available in most emergency rooms including the Gallup Indian Medical Center and is a good reference for the practicing physician.

   c. Dr. Schemer has produced a detailed report provided to the Defendant which includes his summary of the records and testimony, the condition of N.E.D. as reported and the history of her condition which caused her to be brought to the hospital.

d. Dr. Schermer agrees that based upon the history that this six-year-old had fallen, struck her head, was complaining of head pain and crying, the order for a CT scan was proper.

e. Dr. Schermer will testify that based on the information provided, the decision to intubate this child was overly aggressive and unnecessarily subjected N.E.D. to a dangerous procedure and dangerous paralyzing drugs.

f. Dr. Schermer's opinion is based upon the records that reflected that N.E.D.'s oxygen saturation was 98 percent, she had clear lung sounds, good breathing and all other normal findings, with the exception of the report of crying.

g. Dr. Schermer will discuss alternative drugs that do not paralyze thereby depriving N.E.D. of any ability to breath on her own.

h. Dr. Schermer will discuss the reasons why less dangerous drugs would have been the standard of care in this case and the drugs that are accepted in the literature of allowing "conscious sedation."

i. Conscious sedation would have allowed N.E.D. to breathe on her own and would have avoided subjecting N.E.D. to the intubation with the risks associated with that procedure.

j. Dr. Schermer will explain why doing an endotracheal intubation can be dangerous including the risk of dislodgment of the tube when the patient is being moved, such as taking the patient for a CT scan if the patient is not carefully handled and monitored.

k. Dr. Schermer will explain the additional safety to the patient when ongoing monitoring by continuous end tidal capnography is employed.

l. Dr. Schermer concludes from the records that the endotracheal tube was probably not in its proper place initially, which was not detected because no x-ray was taken and that no record of monitoring the patient was recorded until after the arrest and injury occurred.

m. More details of his expected testimony is contained in his affidavit filed as a part of the Federal Rules of Civil Procedure, Rule 26 disclosures.

m. <u>SHARON GUERRA, RN.</u> (Estimated total time 2 hours - Live). Ms. Guerra is a disclosed expert [Doc. 53] specializing in nursing who will testify consistent with her expert witness report provided on December 20, 2017, and her supplemental reports of March 26, 2018 [Doc. 91] and April 30, 2018, and any new and relevant information in formulating her nursing expert opinions.

n. <u>PAUL LOPEZ</u> - (Estimated total time 30 minutes – Live). Mr. Lopez has not been deposed. Mr. Lopez is N.E.D's uncle and was at the hospital visiting Dominique Billy and Baby S.D. when Jacob Dotson signed into triage with N.D. He saw them sitting in the waiting area and then walked with Mr. Dotson when they went to the Emergency Room. Hospital staff would not let him and his wife Alexandra go any further.

o. <u>Richard Miller</u> (Estimated total time 10 minutes – Live). Mr. Miller will authenticate photographs of the Indian Hills Playground equipment.

**DAMAGE WITNESSES:**

p. <u>DOMINIQUE BILLY</u> – (120 minutes – Live). Ms. Billy is the natural mother of N.E.D. and will testify consistent with her deposition testimony and will address the nature of her daughter's injuries', her daily conditions, her role as the past, present, and future caregiver to N.E.D., the medical care received at the Carrie Tingley Children's Hospital; future care and treatment of N.E.D., including home care and placement of N.E.D with specialized full time care. Ms. Billy will review and explain video of N.E.D. before and after the injury in different settings, home, therapy, grandmothers house

q. <u>DENISE TAYLOR, M.D.</u> – (120 minutes – Live). Dr. Taylor is the pediatric physiatrist at the Carrie Tingley Hospital who is responsible for N.E.D.'s care. Dr. Taylor was disclosed by Plaintiffs in their *Initial Disclosure* on July 12, 2017 and in all of the subsequent Plaintiffs' *Supplemental Disclosures* filed in this matter as a treating physician. Dr. Taylor will testify as a treating physician pursuant to Federal Rules of Civil Procedure, Rule 26,

a. Dr. Taylor will testify as to N.E.D.'s past and present condition and what future medical care she will need.

b. Dr. Taylor will testify that the medical care and the medical bills for N.E.D. were medically reasonable and necessary.

c. Dr. Taylor will describe the treatment and care needs for N.E.D. in the future both as an outpatient at Carrie Tingley Hospital, other programs available as well as her needs at home.

d. Dr. Taylor will testify that N.E.D. is in need of constant care and supervision including home therapies in conjunction with what is being done at Carrie Tingley.

e. This treating medical provider may testify about observations based on personal knowledge, including medical treatment of N.E.D. *Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999); *Montoya v. Sheldon*, 286 F.R.D. 602, 619 (D.N.M. 2012).

f. Defendant did not depose Dr. Taylor.

r.  ERIN BIGLER PH.D. – (2.5 hours – Live). Dr. Bigler is a disclosed expert witness [Doc.53] specializing in pediatric neuropsychology who will testify consistent with his expert witness report of January 6, 2018 and any new and relevant information in formulating his medical expert opinions. Defendant did not depose Dr. Bigler. Dr. Bigler will testify live at trial.

s.  STEPHEN NELSON, M.D. – (2 hours – Live). – Dr. Nelson is a disclosed expert witness [Doc. 53] specializing in pediatric neurology who will testify consistent with his expert witness report of December 20, 2017 and any new and relevant information in formulating his medical expert opinions. Defendant did not depose Dr. Nelson. Dr. Nelson will testify live at trial.

t.  JOAN SCHOFIELD, BSN, MBA, CLCP – (2.5 hours – Live). Ms. Schofield is a certified life café planner who will testify regarding the future medical and life care needs for N.E.D. Ms. Schofield provided an expert report on January 11, 2018 [Doc. 53] and a supplemental report on April 2, 2018. Ms. Schofield is continuing to monitor N.E.D.'s continuing future needs for reasonable and safe care for N.E.D. both at home and the recommendations of the treating physicians. Ms. Schofield has reviewed the video tape of N.E.D. before and after the incident and the video recording of N.E.D.'s June 13, 2018 therapy sessions which have been furnished to defendant. She is in the process of interviewing the caregiving companies. Defendant deposed Ms. Schofield. Ms. Schofield will testify live at trial.

u.  BRIAN MCDONALD, Ph.D. – (1 hour – Live). Dr. McDonald is a disclosed expert witness [Doc. 53] as an economist and will testify as the present value of ongoing damages including care costs and the loss of enjoyment of life. Defendant did not depose Dr. McDonald. Dr. McDonald will testify live at trial.

v.  CYNTHIA ATHENS. (30 minutes – Live). Ms. Athens is N.E.D.'s Aunt and was at Julia Lopez's, N.E.D.'s great grandmother's house when Danielle Billy and N.E.D. drove up. She saw them come out of the vehicle and went over to talk to them. She talked with N.E.D. who was whimpering before they went into the house. Ms. Athens will also testify regarding childcare of N.E.D. prior to the incident and care after her injury. Ms. Athens was not deposed.

w.  University of New Mexico Hospital Fiscal Officer/Administrator – (1 hour – Live). This witness will be called to authenticate and verify that the UNM and Carrie Tingley Hospital records are reasonable charges for the medical care and treatment rendered N.E.D and are the customary charges for the State of New Mexico. It is anticipated that Defendant will stipulate as to the admissibility of these records and the reasonableness and necessity of the medical care provided to N.E.D. at UNMH and Carrie Tingley Hospital. If such stipulation is not obtained, a UNMH representative will testify live at trial.

**2.    Plaintiffs may call the following witnesses.**

a. <u>HERITAGE HOME HEALTH CARE AND HOSPICE</u> – Sam Ortega, or another representative from this facility, will testify as to the availability, costs, and needs for their services based upon their assessments of N.E.D. and after attending therapy sessions, viewing video of N.E.D. in the home and at therapy, reviewing pertinent medical records, and interviewing the mother, as well as input from treating physicians.

b. <u>THRIVE SKILLED PEDIATRIC CARE</u>.  Michelle German from Thrive may testify as to their services for homecare assistance and the cost of care based upon the recommendations of treating physicians and what she feels would be necessary to provide for the safe care of N.E.D..

c. <u>UNMH and CARRIE TINGLEY</u> treating providers, including but not limited to Dr. Douglas Barrett, treating neurologist, Dr. John Phillips, Dr.  Kathy Wolfe M.D. and:

    i. <u>AMANDA D. CHAVEZ</u>, Carrie Tingley Physical Therapy (60 minutes – Live);

    ii. <u>ANNIE G. RAMIREZ</u>, Occupational Therapy (60 minutes – Live);

    iii. <u>NICOLE ESSENMACHER</u>, Speech Therapy (60 minutes – Live);

**3.**  **Persons that may be called depending upon issues that might arise at trial:**

a. <u>JULIA LOPEZ</u>. (Live – no deposition). Great-grandmother of N.E.D. Danielle Billy brought N.E.D. over to Ms. Lopez's house after N.E.D.'s fall.  Ms. Lopez cleaned N.E.D. up as she had nicks and dirt from the wood chips on her cheek. N.E.D. showed her the left side of her head and said it was hurting, motioning her left hand over the left side of her head and said "Grandma my head hurts." Ms. Lopez put antibiotic ointment on her scratches, saw no bruising or swelling and N.E.D. was alert and coherent and walking on her own without stumbling. She was whimpering but not crying loudly.  Ms. Lopez told Danielle Billy to take her up to her parents at GIMC.

b. <u>SUSAN BILLY</u>.  (Live – no deposition). Grandmother of N.E.D. Mrs. Billy would have knowledge of damages suffered by N.E.D. from before and after the incident.  The family stayed at their house in Albuquerque for N.E.D.'s inpatient stay at UNMH and currently when they are in town for therapies.  Ms. Billy has also attended some of the therapy sessions with N.E.D.

c. <u>NICOLE STIGER</u>. (Live – no deposition). Rehoboth Christian School, Gallup, New Mexico.  N.E.D.'s Pre-K teacher. Would have knowledge of N.E.D.'s abilities and progress in school.

d. <u>LORI TRUJILLO.</u> (Live – no deposition). Jefferson Elementary School. Gallup, New Mexico. Would have knowledge of N.E.D.'s abilities and progress in school.

e. <u>ALEXANDRA LOPEZ.</u> (Live – no deposition). N.E.D.'s Aunt. Mrs. Lopez passed by with her husband Paul Lopez while Jacob Dotson and N.E.D. were sitting waiting after signing into triage.

**B.    Defendant's Witnesses:**

**1.    Defendant may call or have available at trial the following witnesses:**

a. <u>Dr. Stephen Waite</u> (liability) – Dr. Waite may testify as a fact witness and as an expert treating physician regarding his assessment, diagnosis and treatment of N.E.D.;

b. <u>Respiratory Therapist Ella Begay</u> (liability) – Ms. Begay may testify regarding her assessment, diagnosis and treatment of N.E.D.;

c. <u>RN Kelli Coggins Smith</u> (liability) – Nurse Coggins may testify regarding her assessment, diagnosis and treatment of N.E.D.;

d. <u>Emergency Room Physician Dr. Jack Sharon</u> (expert; liability) - may testify regarding his review of materials and his opinions in this case related to the standard of care and treatment provided by the Gallup Indian Medical Center on February 28, 2016, as set forth in greater detail in his report;

e. <u>Neurologist Dr. Richard Dasheiff</u> (expert; liability and damages) - may testify regarding his review of materials and his opinions in this case related to the standard of care, diagnosis, treatment, and prognosis of Plaintiff N.E.D., as set forth in greater detail in his report;

f. <u>Life care Planner Darius Garcia, BSN, RN</u> (expert; damages) – may testify regarding her review of materials and her opinions in this case regarding the future care and treatment of N.E.D and the cost thereof, as set forth in greater detail in her report;

g. Any witnesses called by Plaintiffs;

h. GIMC Records Custodian

i. UNMH Records Custodian

j.   IHS Records Custodian

## X.  TRIAL PREPARATION

A.    **Exhibits.**

This Court's February 14, 2019 Order (Doc. 148) amended certain pretrial deadlines after the stay in proceedings due to the federal lapse in appropriations was lifted. According to that Order, all exhibits were to be marked and made available to the opposing party by March 29, 2019. On April 4, 2019, the Court granted Defendant's request for an extension to submit, identify, mark and exchange its exhibits from March 29, 2019 to April 12, 2019 (Doc. 166). Plaintiffs' exhibits are marked with numbers; Defendant's exhibits are marked with letters. The identification number or letter will remain the same whether the exhibit is admitted or not.

The parties were required to confer about all trial exhibits and, by April 19, 2019 (*see* Doc. 166), file a "consolidated exhibit list identifying all exhibits that the parties have stipulated are admissible" and a separate "consolidated exhibit list identifying all exhibits the parties have stipulated to be authentic, but to which there are other objections," along with a statement of the objecting party's grounds for objections. The parties complied, and during a pretrial conference on April 30, 2019, the Court made the following pretrial rulings pertaining to exhibits:

- Plaintiffs' Exhibits 1, 2, 26, 35, 45, 46, 47, 54, 55, 56, 57, 58 and 59 were admitted without objection. Plaintiffs' Exhibit 42 was admitted over the objection.

- Plaintiffs' Exhibits 27 and 36 were withdrawn.

- Defendant's Exhibits D, E, G, I, and J were admitted without objection.

- Defendant's Exhibit H was withdrawn.

- Plaintiffs clarified that Plaintiffs' Exhibits 70 through 87 are medical authorities and not intended to be admitted as exhibits. Accordingly, the Court did not admit Plaintiffs' Exhibits 70 through 87.

- The Court ordered the parties to submit copies of exhibits on which it has not yet ruled by May 6, 2019. The Court reviewed those exhibits and issued additional pretrial rulings under separate order on May 21, 2019. *See* Order (Doc. 176). Those rulings are incorporated here.

**B.    Witness Lists.**

In the parties' Proposed Pretrial Order (Doc. 126), Plaintiffs listed numerous witnesses that they "may" call at trial. To avoid wasting time and resources of the parties, the Court, and the potential witnesses, and to promote judicial efficiency, each party must file a final trial witness list by **July 5, 2019**.

**C.    Submission for Bench Trials.**

1.    The parties must submit one mutually approved set of proposed findings of fact and conclusions of law no later **July 15, 2019**.  For those findings of fact and conclusions of law the parties are unable to agree upon, each party must submit its own proposed findings of fact and conclusions of law at the same time as submission of the mutually approved set.

2.    The parties should submit the findings of fact and conclusions of law in a format compatible with MS Word.  Please refer to the procedures, available on the court's web site, for electronically submitting proposed text.

3.    No later than **August 1, 2019**, counsel must exchange and provide the Court with memoranda of law containing: (1) a statement of the material facts the party intends to establish at trial, (2) a description of the evidence the party intends to introduce at trial supporting those

material facts, and (3) a discussion addressing the material facts, evidentiary issues, and legal issues that remain in dispute.

4.  By **August 1, 2019**, the parties must provide to Judge Eaton, a copy of the designated deposition testimony that the Court has admitted into evidence. Judge Eaton would prefer that the parties provide the deposition testimony in electronic format to the following address: Chambers_of_Sr_Judge_Eaton@cit.uscourts.gov.

## XI. OTHER MATTERS

**A.    Settlement Possibilities**

1.  The possibility of settlement in this case is considered:

_X___ Poor _____ Fair _____ Good _____ Excellent _____ Unknown

2.  Do the parties have a settlement conference set with the assigned Magistrate Judge? _____ Yes    __X____ No.

If yes, when? The parties have attended two prior settlement mediations with Judge Ritter.

If a settlement conference has already been held, indicate approximate date: April 23, 2018 and May 17, 2018.

Would a follow-up settlement conference be beneficial? _____ Yes _X___ No

3.  Does either party wish to explore any alternatives for dispute resolution such as mediation or a summary jury trial?

If yes, please identify: _____

If no, explain why not: Mediation has not been successful. Plaintiffs request to go to trial.

**B.    Length of Trial and Trial Setting.**

1.  This action is a ___X___ Bench Trial _____ Jury Trial _____ Both

2.    The case is set for trial beginning on <u>September 17, 2019 at 9:00 a.m. before the</u>

<u>Honorable Richard K. Eaton, 421 Gold Ave. SW, 6th Floor Courtroom, Albuquerque.</u>

3.    The estimated length of trial is _9_ days.

## XII. EXCEPTIONS

*Plaintiffs reserve the right to file their own Findings of Fact and Conclusions of Law as stated in Section X(c) above.*

*Plaintiffs' Administrative Claims were timely and placed the United States and its agencies, Department of Health and Human Services (Indian Health Services), on adequate notice regarding claims contained in Plaintiffs' First Amended Complaint. Plaintiffs' discovery revealed the federal job description and physical requirements of a respiratory therapist as such relates to Ella Begay.*

*Defendants object to the production of witnesses by deposition designation where not established that they are otherwise unavailable.*

*Defendants reserve the right to file Motions in Limine, Findings of Fact and Conclusions of Law within the deadlines provided by the Court.*

## XIII. MODIFICATIONS-INTERPRETATION

The Pretrial Order when entered will control the course of trial and may only be amended *sua sponte* by the Court or by consent of the parties and Court approval. The pleadings will be deemed merged herein.

_____
SENIOR DISTRICT COURT JUDGE