IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

DENNIS MURPHY, Guardian Ad Litem
For N.E.D., an incapacitated minor; JACOB DOTSON;
DOMINIQUE BILLY, individually and as next friends of I.C. and
S.D., minors,

        Plaintiffs,                        No.  CIV 17-cv-00384 JAP/JHR

        vs.

THE UNITED STATES OF AMERICA,

        Defendant.

### PLAINTIFFS' MEMORANDUM OF LAW

*[Per the May 1, 2019 letter form Judge James Parker Due to*
*Judge Richard Eaton by August 1, 2019]*

Plaintiffs respectfully file their *Memorandum of Law* to Judge Richard Eaton as directed by Judge James Parker on May 1, 2019.

## I.    Statement of the Material Facts Plaintiffs' Intend to Establish at Trial

Plaintiffs tender the following Statement of Material Facts that will be established at trial on September 17, 2019:

1.  The Court has subject matter and personal jurisdiction arising under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671, *et. seq.;* 28 U.S.C. §1346(b), and the substantive law of New Mexico applies.

2.  All of the employees at the Gallup Indian Medical Center ["GIMC"] were federal employees for purposes of imposing liability under the FTCA.

3.  Plaintiffs Dominique Billy and Jacob Dotson are the parents of N.E.D.

4.  N.E.D's siblings are I.C. and S.D.

5. Prior to February 28, 2016, N.E.D. was a healthy and fully functioning vibrant six year old girl without any cognitive deficits or developmental problems.

6. N.E.D. was the first child born to Plaintiffs Dominique Billy and Jacob Dotson.

7. On the afternoon of February 28, 2016, six year old N.E.D. fell off playground equipment striking her head on the ground at the Indian Hills Playground in Gallup, New Mexico.  N.E.D. did not lose consciousness at any time after the fall.

8. N.E.D. did not suffer from a global hypoxic brain injury from the fall from the playground equipment.

9. N.E.D. had no focal neurological findings on her neurological exam at the time of her examination at GIMC Emergency Room, had spontaneous respiration and her pupils were equal round and reactive to light, was not hypoxic and not unconscious upon admission to the Emergency Room.

10. N.E.D. met PECARN ("Pediatric Head Injury/Trauma Algorithm") guidelines with Glasgow Coma Scale less than 14 and agitation that supported the decision to conduct a CT scan on N.E.D. to evaluate trauma to her brain.

11. Under the circumstances of this case, there was no reason to rush medical procedures in any way that would justify omission of following recognized protocols for the protection of N.E.D.

12. Following his examination of N.E.D., Dr. Stephen Waite determined that N.E.D. should have a head CT and decided that she needed to be intubated in order to perform the CT scan, despite her having a pulse ox of 98% on room air.

13. Prior to intubation, N.E.D. was administered Ativan and the drug succinylcholine, a paralytic drug ordered by Dr. Waite which prevented N.E.D. from breathing on her

own, thereby making her totally dependent upon the medical personnel at GIMC to assure she was receiving adequate oxygen.

14. GIMC medical personnel unnecessarily rushed N.E.D. to the CT scan room without performing required tests necessary to confirm the placement of the endotracheal tube, such as a chest x-ray and a continuous end tidal capnography, to ensure that she was being properly oxygenated and monitored.

15. There were other viable options to calm N.E.D. in the GIMC Emergency Room, including pain medication and sedative/hypnotic agents rather than paralyzing her with Ativan and succinylcholine and intubating a child/patient to obtain a CT scan.

16. Had an x-ray been performed immediately following the first intubation, and a continuous end tidal capnography been conducted, the misplacement of the endotracheal tube would, more likely than not, have been recognized and the tube could have been re-positioned.

17. A vital sign monitor (without the continuous capnography CO2 detector) was attached to N.E.D. which was intended to track vital signs.

18. The audible warning device on the vital sign monitor had been turned off prior to the cardiac arrest. The vital sign monitor attached to N.E.D. did not sound an alarm when her vital signs indicated that she was experiencing a life threatening condition.

19. N.E.D. was transferred to the CT scanner room after being intubated by Dr. Waite without automatic respiratory breathing equipment being utilized.

20. During the transport of N.E.D. to and from the CT scan room, Nurse Coggins and another nurse were pulling the gurney and Ella Begay, R.T. was at N.E.D.'s head. Ella Begay was supposed to be administering the oxygen and monitoring the breathing and

3

was responsible for protecting N.E.D.'s airway and the endotracheal tube while N.E.D. was intubated.

21. Ella Begay's task of monitoring and supplying oxygen was by means of manual "bagging" to supply O2 to N.E.D. that required constant contact with the bag attached to the intubation tube to administer a "breath" with each squeeze of the bag.

22. Ella Begay could not keep up the pace in "running" with the gurney claiming she had bad knees.

23. Nurse Coggins and Ella Begay had an argument (referred to as a "confrontation") while transporting N.E.D. to the CT scan room based on Ella Begay's inability to keep up with the pace of transporting N.E.D. to the CT Scan room.

24. Because of that confrontation, Ella Begay ceased functioning as a respiratory therapist and turned the task of bagging or supplying O2 over to Nurse Coggins in the CT room.

25. As a consequence of this confrontation, there was no clear transfer of who was monitoring the O2 supply and although each blames the other, no one was monitoring the O2 supply to N.E.D.

26. At the conclusion of the CT scan, Nurse Coggins found the tubing disconnected from the oxygen supply to N.E.D.

27. When the cardiac arrest was detected, Nurse Kelli Coggins began CPR on N.E.D. due to a "Code Blue" being called.

28. No one was observing the vital sign monitor while N.E.D. was in the CT scanner or during her transport to the CT scan room.

29. The CT of the head revealed no acute intracranial pathology prior to the events in the CT scanner or from the fall from the playground equipment.

30. As a result of being deprived of oxygen while intubated at GIMC, N.E.D. suffered a devastating global hypoxic brain injury separate and distinct from the injury that she suffered when she fell off the playground equipment.

31. The hypoxic brain injury suffered by N.E.D. was caused, in its entirety, by the failure to keep her properly oxygenated and monitored while she was intubated.

32. N.E.D. has suffered, and will continue to a reasonable degree of medical certainty, severe neurological impairments in the future, including epilepsy/seizures, cognitive impairment/mental retardation, ADHD/learning disabilities, emotional/behavioral issues, cerebral palsy/movement disorders, visual  and/or hearing impairments, feeding and growth issues, decreased ability to learn or be employed meaningfully and increased pain and suffering.

33. At no time during the emergency care of N.E.D. did Stephen Waite, M.D. advise Jacob Dotson of the risks and foreseeable risks that use of paralytic drugs could cause and the use of an endotracheal tube could result in injuries to his daughter.

34. After the cardiac arrest and re-intubation by Dr. Waite, N.E.D. was transported by helicopter to the University of New Mexico Hospital ("UNMH") arriving at 6:45 p.m.

35. MRIs taken at UNMH confirmed that N.E.D. suffered a severe hypoxic brain injury as a result of the failure of the medical personnel at GIMC to properly care for and monitor N.E.D.

36. The discharge summary from UNMH on August 3, 2016 confirmed the diagnosis of severe, global neurodegenerative changes as a result of the severe hypoxic/ischemic brain injury with significant major severe diffuse cerebral

dysfunction, severe neurocognitive disorder, profound functional motor deficits, and complex care coordination.

37.     N.E.D. will never be able to live on her own and is incapable of ever becoming employed.

38.     N.E.D. functions at a level similar to a two-to three-year old.

39.     All regions of N.E.D.'s brain have been affected and her behavior, motor language, visuospatial, intellectual, cognitive and emotional functions are at or below the 1st percentile as compared to children of similar age.

40.     N.E.D will require close 24/7 one on one supervision by qualified personnel for the remainder of her life.

41.     It is in N.E.D.'s best interest that she remain at home in the care and custody of her family members for her lifetime.

42.     N.E.D.'s life expectancy for a 9-year-old female is 72.6 years or to an age of 81 and such life expectancy is directly related to the quality of lifetime care she receives.

43.     Plaintiffs' life care plan covers the future medical needs to a reasonable medical certainty as directed by N.E.D.'s treating physicians with a present value of approximately $16,201,286.00.

44.     In the event N.E.D. does not remain at home after she turns 21 through her life expectancy, a  specialty brain injury  residential program has an annual cost of approximately $346,750.

45.     N.E.D.'s medical bills as of January 15, 2019 are approximately $614,370.61 and are reasonable and necessary, and customary for New Mexico.

46.    Both Dominique Billy and Jacob Dotson have suffered economic damages.

47.    Dominique Billy and Jacob Dotson have performed services after receiving training equaling that of medically trained medical personnel in the daily care of N.E.D., including changing feeding tubes, feeding, and performing tasks at a higher lever comparable to nursing care.

48.    Dominique Billy's care during N.E.D.'s hospitalization as a non-licensed care giver is $35 per hour.

49.    Dominique Billy's care during N.E.D.'s discharge from UNMH is commensurate with a LPN at $45 per hour.

50.    Dominique Billy has been required to transport N.E.D. from their residence in Gallup, New Mexico to the Carrie Tingley Hospital two to three times a week since her discharge with a total round trip of 280 miles.

51.    Total past value of medical related services rendered by family members and cost of mileage is as follows:

   a.    Dominique Billy's mileage from August 3, 2016 projected through September 19, 2019 is approximately $73,483.20l;

   b.     Dominique Billy's care prior to UNMH discharge is valued at approximately $87,920.00 while N.E.D. was in the hospital;

   c.    The family's total past care for N.E.D. is approximately $1,224,720.00 from date of discharge to September 17, 2019.

52.    Total value of family services is calculated at approximately $1,386,123.20, which includes mileage to and from Albuquerque for out-patient care.

53.     Dominique Billy and Jacob Dotson are capable of managing an award with a local trustee and administrator for their daughter's financial recovery and to facilitate the required medical care and programs as directed by her treating physicians without the need of an irrevocable reversionary trust.

54.     The New Mexico Bank and Trust is capable of administering a trust to be established for the lifetime medical needs of N.E.D.

55.     Attorney's fees at 25% plus New Mexico Gross Receipts Tax are to be awarded from any judgment ordered by the Court.

56.     Taxable costs are to be awarded to Plaintiffs.

## II.     Description of the Evidence Plaintiffs' Intend to Introduce At Trial Supporting Those Material Facts.

The Court ruled on May 21, 2019 [Doc. 176] and on July 22, 2019 [Doc. 186] admitting the following documents and exhibits:

| Exhibit | Description | Status |
|---------|-------------|--------|
| 1 | GIMC certified medical records (redacted as to SSN) | Admitted on May 21, 2019 [Doc. 176] |
| 2 | Gallup Med Flight Records | Admitted on May 21, 2019 [Doc. 176] |
| 3.1 C.1 | Excerpts of UNMH Records | Admitted on July 22, 2019 [Doc. 186] |
| 14.1 | 07/11/2016 Letter from Aaron K. Youselew RT(R), Diagnostic Medical Imaging Supervisor at GIMC, providing timeline of Dotson radiology occurring on 02/28/2016 | Admitted on July 22, 2019 [Doc. 186] |
| 14.2 | Report of GIMC CT Brain 02/28/16   16:28 | Admitted on July 22, 2019 [Doc. 186] |
| 14.3 | Report of GIMC X-ray chest 02/28/16   16:35 | Admitted on July 22, 2019 [Doc. 186] |
| 18.1 | Report of UNMH CT Head, | Admitted on July 22, 2019 |

| | 02/28/16  10:10 | [Doc. 186] |
|---|---|---|
| 18.2 | Report of UNMH MRI Brain 03/02/16  16:16 | Admitted on July 22, 2019 [Doc. 186] |
| 18.3 | Report of UNMH MRI Brain, 08/15/18  12:20 | Admitted on July 22, 2019 [Doc. 186] |
| 26 | PowerPoint of select photos of GIMC Emergency Department | Admitted on May 21, 2019 [Doc. 186] |
| 28 | Exemplar – Pediatric Endotracheal tube | Admitted on May 21, 2019 [Doc. 176] |
| 29 | Exemplar – Adult Endotracheal tube | Admitted on May 21, 2019 [Doc. 176] |
| 30 | Exemplar – Pediatric Model 48" | Admitted on May 21, 2019 [Doc. 176] |
| 35 | Curriculum Vitae of Dr. Stephen Waite | [Doc. 176] |
| 42 | VIDEO PRESENTATION- Natalie Before the Fall and After her Injury | Admitted on May 21, 2019 [Doc. 176] |
| 45 | N.E.D. Education records, Rehoboth Early Childhood Center Pre-K records | Admitted on May 21, 2019 [Doc. 176] |
| 46 | N.E.D. Education Records:  Jefferson Elementary School, Kindergarten, Gallup McKinley School District | Admitted on May 21, 2019 [Doc. 176] |
| 47 | N.E.D. Jefferson Elementary admin Records | Admitted on May 21, 2019 [Doc. 176] |
| 50 | Joan Schofield Life Care Plan, Amended 12/21/2018 [*Plaintiffs will be allowed to use the table excerpts only*] | Admitted on July 22, 2019 [Doc. 186], tables only for demonstrative purposes |
| 52.1 | Brian McDonald Report, N.D., Updated 12/24/2018 [*Plaintiffs will be allowed to use the table excerpts only*] | Denied [Doc 176] however tables excerpts may be used as demonstrative aids [Doc. 186] |
| 54 | Curriculum Vitae of Erin D. Bigler, Ph.D. | Admitted on May 21, 2019 [Doc. 176] |

| 55 | Curriculum Vitae of Alexander W. Schermer, MD, FACEP | Admitted on May 21, 2019 [Doc. 176] |
|---|---|---|
| 56 | Curriculum Vitae of Sharon Guerra, RN, MSN, BSN NE-BC | Admitted on May 21, 2019 [Doc. 176] |
| 57 | Curriculum Vitae of Stephen Nelson, MD, PhD, FAAP, FAACPDM | Admitted on May 21, 2019 [Doc. 176] |
| 58 | Curriculum Vitae of Joan Schofield, RN, BSN, MBA, CNLCP | Admitted on May 21, 2019 [Doc 176] |
| 59 | Curriculum Vitae of M. Brian McDonald, Ph.D. | Admitted on May 21, 2019 [Doc. 176] |
| D | | [Doc. 176] |
| E | | [Doc. 176] |
| G | | [Doc. 176] |
| I. | Curriculum Vitae of Dr. Jack L. Sharon | *[Doc 176]* |
| J | | |
| K | Curriculum Vitae of Darius Y. Garcia, RN, BSN, CLNC, MSCC, CNLCP | Admitted on May 21, 2019 |

The following documents and exhibits are pending admission by the Court at time of trial:

| Exhibit | Description | Status |
|---|---|---|
| 3 | UNMH Medical Records | ***Not Admitted [Doc 186] except to provide foundation for MR excerpts and Witness testimony at trial*** |
| 4 | UNMH Med records- Select | *[Doc 176]* <br><br> *Court to Reserve Ruling* |
| 4.1 | Federal Rules of Evidence 1006 Chronology of Neurobehavioral search of medical records | *[Doc 176] Court to Reserve Ruling* |
| 4.2 | Color Calendar created from Federal Rules of Evidence 1006 Neurobehavioral search of medical records | *[Doc 176] Court to Reserve Ruling* |

| 5 | Family Eyecare Medical Records | *[Doc 176] Court to Reserve Ruling* |
| 6 | Sandia Neuropsychology, Dina Hill, Ph.D. | [Doc. 176] *Court to Reserve Ruling* |
| 9 | UNMH Medical bills for treatment received by Natalie Dotson for 02/28/2016 | *[Doc 176] Court to Reserve Ruling* |
| 10.1 | Federal Rules of Evidence, Rule 1006, Medical Bills – SUMMARY | *[Doc 176] Court to Reserve Ruling* |
| 10.2 | Federal Rules of Evidence, Rule 1006, Medical Bills – DETAIL | *[Doc 176] Court to Reserve Ruling* |
| 13 | Radiology Index (GIMC and UNMH through 4/14/16; 8/15/18) | *[Doc 176] Court to Reserve Ruling* |
| 14 | GIMC Radiology CD | ***Withdrawn  [Doc 186] however the parties may move to admit excerpted portions with proper foundation.*** |
| 14.4 | Digital Print of GIMC X-ray chest 02/28/2016 17:13 57. | *[Doc 186] Court to Reserve Ruling* |
| 14.5 | Digital Print of GIMC X-ray chest 02/28/2016 17:32 | *Doc 186 Court to Reserve Ruling* |
| 18 | UNMH Radiology CD | ***Withdrawn  [Doc 186] however the parties may move to admit excerpted portions with proper foundation.*** |
| 18.4 | A-K Screen Shots of August 15, 2018 MRI | ***Not Admitted [Doc 186] however the parties may move to admit 18.4 or portions thereof with proper foundation*** |
| 19 | Model of Brain | *[Doc 176] Court to Reserve Ruling* |
| 37 | Stephen Waite Ohio Revocation Order | *[Doc 176] Court to Reserve Ruling* |
| L. | D. Garcia – Table 3.7.19 | *[Doc 176]* |

| | | *Court to Reserve Ruling* |
|---|---|---|

**Exhibit Notes:**

**The following exhibits were withdrawn:** [Doc. 176] 27, 36, H

**The following exhibits were denied:** [Doc. 176]: 25 26, 31, 40, 41, 53, 50, 51.1, 51.2, 51.3, 51.4, 52.1, 52.2, 53(a), 53(b)

**The following exhibits are authorities and not intended to be admitted as exhibits** P 70-87 [Doc. 176]

## WITNESSES

Plaintiffs filed their Final Witness List on July 3, 2019 [Doc. 181]. Defendant has filed its Final Witness List on July 5, 2019. [Doc. 182].

**III.    Discussion Addressing the Material Facts, Evidentiary Issues and Legal Issues That Remain in Dispute.**

The parties have disclosed liability and damages expert witnesses [Docs. 52, 76, 80, 82, 83, 91, 135, 142, and 158] who will address Plaintiffs' negligence and damages claims, including breaches of the standards of care and the proximate cause (causation) against the United States in the medical care of N.E.D. on February 28, 2016.

## LIABILITY

Plaintiffs do not dispute that a CT scan should have been performed on this date at the GIMC Emergency Room inasmuch as N.E.D. fell and struck her head that afternoon.

Accordingly, the liability issues in dispute are:

1.    Whether the medical negligence at the GIMC caused a separate and distinct injury and not an enhanced injury as a result of the fall from the playground equipment on February 28, 2016;

2.   Whether a breach of the standards of care by the GIMC medical personnel occurred when Dr. Waite decided to conduct an intubation using paralytic drugs rather than using alternative medications;

3.   Whether GIMC's medical personnel failed to properly monitor N.E.D.'s oxygen levels and to protect her airway at all times during her intubation;

4.   Whether the hypoxic brain injury suffered by N.E.D. was caused by the failure to keep her properly oxygenated and monitored while she was intubated;

5.   Whether GIMC failed to properly maintain the portable vital signs monitor in the emergency room on February 28, 2016;

6.   Whether GIMC failed to provide continuous capnography monitoring equipment, which was available at the time, to monitor N.E.D. while she was intubated on February 28, 2016.

### A.   "Separate and Distinct Injury" vs. "Enhanced Injury"

On the afternoon of February 28, 2016, a healthy and vibrant six year old N.E.D., who had no cognitive deficits or prior brain injuries, fell off playground equipment striking her head on the ground at the Indian Hills Playground in Gallup, New Mexico.  N.E.D. did not lose consciousness at any time after the fall. Plaintiffs' claim that as a result of the fall N.E.D. had, at best, a mild concussion which warranted a CT scan to rule out any brain trauma.  At the time of her GIMC Emergency Room examination, N.E.D. had (1) no focal neurological findings on her neurological exam at the time of her examination at GIMC Emergency Room; (2) had spontaneous respiration and her pupils were equal round and reactive to light, and (3) was not hypoxic and not unconscious upon admission to the Emergency Room.

Initial vital signs were performed at 4:05 pm and recorded a temperature of 99.9 F, Pulse of 147, RR of 40, and oxygen saturation of 98% on room air, Glasgow Coma Scale

["GCS"] was 10 (Eyes =4, Verbal =2, Motor =4). This was the only set of vital signs recorded in the medical chart until after N.E.D. went into Cardiopulmonary Arrest at or during the taking of the CT scan. *Plaintiffs' Trial Exhibits - GIMC medical records.*

Dr. Waite noted that the patient had head pain, showed signs of confusion and "screams hysterically" but also noted that N.E.D. was hemodynamically stable, no tachypnea, no hypoxia; neurologic exam was non-focal; heart was regular rhythm without murmur, gallops or rubs; lungs were clear to auscultation without wheezes, rales, or rhonchi; abdomen was soft and non-tender; skin did not show any bruises. *Testimony of Alex Schermer, M.D.; Plaintiffs' Trial Exhibit 1-GIMC medical records; Testimony of Stephen Waite, M.D.*

N.E.D. met PECARN guidelines with GCS less than 14 and agitation that supported the decision to conduct a CT scan on N.E.D. to evaluate trauma to her brain. Under the circumstances of this case, there was no reason to rush medical procedures in any way that would justify omission of following recognized protocols for the protection of N.E.D. She had no focal neurological findings on her neurological exam at the time of her examination at GIMC Emergency Room, had spontaneous respiration and her pupils were equal round and reactive to light, was not hypoxic and not unconscious upon admission to the Emergency Room.

Defendant admits that N.E.D. had no focal neurological findings on her neurological exam at the time of her examination at the Emergency Room. *Plaintiffs' First Request for Admission, No. 8.* Defendant also admits that upon arrival at the Emergency Room, N.E.D. had spontaneous respiration and her pupils were equal round and reactive to light. *Plaintiffs' First Request for Admission, Nos. 5 and 9.*   Defendant further admits that N.E.D. was not hypoxic and not unconscious upon admission to the Emergency Room. *Plaintiffs' First Request for Admissions, Nos. 3, 27; Testimony of Stephen Waite, M.D.*

As a matter of the undisputed medical facts and to a reasonable medical certainty, therefore, N.E.D. did not have a hypoxic brain injury at the time of her presentation at the GIMC Emergency Room. Her global hypoxic injury was proximately caused by the negligent acts and omissions at GIMC after her intubation by Dr. Waite and the negligence of the GIMC medical personnel. Such acts and failures to act proximately caused her to suffer a "separate and distinct injury" and not an "enhanced injury" occurring from the fall from the playground equipment. *Plaintiffs' First Amended Complaint* [Doc. 51, ¶35]; *Testimony of Alex Shermer, M.D.*; *Testimony of Stephen Nelson, M.D; Testimony of Erin Bigler, Ph.D.*; *Lujan v. Healthsouth Rehabilitation,* 120 N.M. 422, 902 P.2d 1925 (1995).

### B.   Intubation and Paralytic Drugs

Small children are vulnerable to endotracheal tube displacement requiring special care in monitoring and placement should be confirmed after each time a patient is moved. *Testimony of Alex Schermer, M.D.*  Dr. Waite decided that N.E.D. needed to be intubated in order to perform the CT scan. *Plaintiffs' Trial Exhibits 1 - GIMC medical records; Testimony of Stephen Waite, M.D.* ATLS ("Advanced Trauma Life Support") guidelines for intubation provide that intubation should only be performed with a GCS Score of 8 or less, airway obstruction, persistent hypoxia or inadequate ventilation. *Testimony of Alex Schermer, M.D.*   N.E.D. did not have an airway obstruction, persistent hypoxia or inadequate ventilation at the time of intubation. *Testimony of Alex Schermer, M.D.; Plaintiffs' Trial Exhibit 1-GIMC medical records.* N.E.D. had adequate oxygenation before she was intubated, with a pulse ox of 98% on room air. *Plaintiffs' Trial Exhibit 1-GIMC medical records; Testimony of Alex Schermer, M.D.*

There are many safe alternatives including pain medication and sedative/hypnotic agents rather than paralyzing and intubating a child/patient to obtain a CT scan. *Testimony of*

*Alex Schermer, M.D.; Testimony of Stephen Waite, M.D.* There were other viable options to calm N.E.D. in the GIMC emergency room sufficiently to be able to perform a head CT without having to paralyze and intubate her. *Testimony of Alex Schermer, M.D.* Prior to intubation, N.E.D. was administered Ativan and the drug succinylcholine, a paralytic drug ordered by Dr. Waite which prevented N.E.D. from breathing on her own, thereby making her totally dependent upon the medical personnel at GIMC to assure she was receiving adequate oxygen. *Testimony of Alex Schermer, M.D.; Plaintiffs' Trial Exhibit 1-GIMC medical records; Testimony of Stephen Waite, M.D.* Once N.E.D. was paralyzed, she was completely dependent on the respiratory therapist, nurse, and/or a mechanical ventilator to breathe for her. *Testimony of Alex Schermer, M.D.* At 4:25 p.m., another dose of the paralytic drug Ativan and succinylcholine were given with a second dose of Ativan at 4:26pm. *Testimony of Alex Schermer, M.D.; Plaintiffs' Trial Exhibit 1-GIMC medical records.*

Plaintiffs claim that when Defendant decided to intubate N.E.D. and administer paralytic drugs which paralyzed her breathing ability, there was a failure to provide adequate oxygenation to her and to monitor such oxygen with a chest x-ray, the use of continuous end tidal capnography, and the use of the vital signs monitor while she was intubated. Such failures were deviations from the standards of care. The standard of care required that N.E.D. be connected to an adequate oxygen supply at all times while intubated.

### C.    Failure to Monitor

In the monitoring of an intubated patient, the standard of care requires that following intubation, continuous end tidal capnography be used to confirm placement of the tube and monitor the placement of the tube supplying oxygen to the patient to assure an adequate supply of O2. *Testimony of Alex Schermer, M.D.; Testimony of Stephen Nelson, M.D.; 2010 American Heart*

*Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care.*
Continuous capnography equipment would detect early signs of a failed O2 supply even before
other monitors show a change. The American Heart Association guideline provides: "Continuous
waveform capnography is recommended in addition to clinical assessment as the most reliable
method of confirming and monitoring correct placement of an endotracheal tube (Class I, LOE
A)". *Testimony of Alex Schermer, M.D.*

The standard of care requires that a properly operating vital signs monitor with proper
continuous CO2 monitor attachments and a functioning alarm system be attached to an intubated
patient in order to confirm and monitor the patient's vital signs, including respirations, pulse
oximetry, O2 supply and heartbeat. *Testimony of Alex Schermer, M.D.; Testimony of Stephen
Nelson, M.D.* A vital sign monitor (without the CO2 detector) was attached to N.E.D. which was
intended to track vital signs. *Plaintiffs' Trial Exhibit 1-GIMC medical records; Deposition
Testimony of Kelli Coggins, R.N.*

### 1. <u>Trip to CT Scan Room</u>

N.E.D. was transferred to the CT scanner room after being intubated by Dr. Waite.
*Plaintiffs' Trial Exhibit 1-GIMC medical records; Deposition Testimony of Kelli Coggins, R.N.;
Testimony  of Stephen Waite, M.D.; Deposition Testimony of Ella Begay, R.T.* No automatic
respiratory breathing equipment was utilized. *Deposition Testimony of Kelli Coggins, R.N.;
Deposition Testimony of Ella Begay, R.T.; Plaintiffs' Trial Exhibit 1-GIMC medical records.*

During the transport of N.E.D. to the CT scan room, Nurse Coggins and another nurse were
pulling the gurney and Ella Begay, R.T. was at N.E.D.'s head. Ella Begay was supposed to be
administering the oxygen and monitoring the breathing. Ella Begay was responsible for protecting
N.E.D.'s airway and the endotracheal tube while N.E.D. was intubated. *Deposition Testimony of*

*Kelli Coggins, R.N.; Deposition Testimony of Ella Begay, R.T.* Ella Begay's task of monitoring and supplying oxygen was by means of a manual "bagging" to supply O2 to N.E.D. that required constant contact with the bag attached to the intubation tube to administer a "breath" with each squeeze of the bag. *Deposition Testimony of Kelli Coggins, R.N.; Deposition Testimony of Ella Begay, R.T.* Ella Begay could not keep up the pace in "running" with the gurney claiming she had bad knees. *Deposition Testimony of Kelli Coggins, R.N.; Deposition Testimony of Ella Begay, R.T.*

### 2. <u>GIMC Personnel Failure to Monitor – "Confrontation"</u>

Nurse Coggins and Ella Begay had an argument (referred to as a "confrontation") while transporting N.E.D. to the CT scan room based on Ella Begay's inability to keep up with the pace of transporting N.E.D. to the CT Scan room. *Deposition Testimony of Kelli Coggins, R.N.; Deposition Testimony of Ella Begay, R.T.; Deposition Testimony of Ernest Sandoval.* Because of that confrontation, Ella Begay, the respiratory therapist, ceased functioning as a respiratory therapist and turned the task of bagging or supplying O2 over to Nurse Coggins. *Deposition Testimony of Kelli Coggins, R.N.; Deposition Testimony of Ella Begay, R.T.* As a consequence of this confrontation, there was no clear transfer of who was monitoring the O2 supply and although each blames the other, no one was monitoring the O2 supply to N.E.D. *Deposition Testimony of Kelli Coggins, R.N.; Deposition Testimony of Ella Begay, R.T.*

At the conclusion of the CT scan, Nurse Coggins found the tubing from the oxygen supply to N.E.D. disconnected, *Deposition Testimony of Kelli Coggins, R.N.,* and the monitor was noted to have a low heart rate leading to a cardiac arrest. There was no alarm from the monitor when N.E.D. had this low heart rate. *Deposition Testimony of Ella Begay, R.T.; Plaintiffs' Trial Exhibit 1- GIMC medical records.* When the cardiac arrest was detected, Nurse Kelli Coggins began CPR

on N.E.D. due to a "Code Blue" being called. *Plaintiffs' Trial Exhibit 1- GIMC medical records; Deposition Testimony of Kelli Coggins, R.N.*

The standard of care requires that medical personnel who accompany an intubated patient for a CT scan carefully monitor the patient to ensure that the patient is properly oxygenated. *Testimony of Alex Schermer, M.D.* This is particularly important in a child as they are vulnerable to tube displacement requiring special care in monitoring. Placement should be confirmed after each time the child/patient is moved. This was not done. *Testimony of Alex Schermer, M.D.* For some or all of the time while N.E.D. was being transported to and from the CT scan room and during the CT scan, N.E.D. was not connected to an oxygen supply. *Plaintiffs' Trial Exhibit 1- GIMC medical records; Testimony of Dolores Gonzales, R.N.; Deposition Testimony of Kelli Coggins, R.N.; Deposition Testimony of Ella Begay, R.N.*

It is the standard of care to monitor critical or intubated patients with pulse rate, respiration rate, cardiac lead tracing, pulse oximetry, and continuous end tidal $CO_2$ detection. *Testimony of Alex Shermer, M.D.* Dr. Waite and the GIMC Emergency Room medical personnel failed to monitor N.E.D.'s carbon dioxide levels continuously after she was intubated which constituted a breach of the standard of care. *Testimony of Alex Schermer, M.D.; Testimony of Dolores Gonzales, R.N.; 2010 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care.* The standard of care requires that the vital sign monitor be properly working and activated when placed on an intubated patient. No one was observing the vital sign monitor while N.E.D. was in the CT scanner or during her transport to the CT scan room and the monitor failed to sound an alarm when N.E.D. was in distress *Deposition Testimony of Kelli Coggins, R.N.; Deposition Testimony of Richard Tyler; Deposition Testimony of Ella Begay, R.T.*

Failure to conduct vital sign monitoring is a departure from the standard of care for N.E.D. as the vital signs in a critical patient should be evaluated every 5 to 15 minutes depending on hospital protocols. *Testimony of Alex Shermer, M.D.* N.E.D. did not have any documented monitoring after her initial evaluation in the emergency room or after her intubation until after her cardiopulmonary arrest. *Testimony of Alex Shermer, M.D.*; *Plaintiffs' Trial Exhibits 1- GIMC medical records.*

C.     **GLOBAL HYPOXIC BRAIN INJURY AND CARDIAC ARREST**

The CT of the head revealed no acute intracranial pathology prior to the events in the CT scanner. *Plaintiffs' Trial Exhibit 1-GIMC medical records.* This finding indicates that her fall from the playground equipment did not cause a hypoxic injury to her brain. N.E.D. was non-responsive when seen by Dr. Waite following the CT scan. *Plaintiffs' Trial Exhibit 1-GIMC medical records; Testimony of Stephen Waite, M.D.* The most common cause for pediatric bradycardia is respiratory failure. *Testimony of Alex Schermer, M.D.; Testimony of Stephen Nelson, M.D.; Testimony of Stephen Waite, M.D.* The failure to maintain an adequate oxygen supply was a breach of the standard of care. *Testimony of Alex Shermer, M.D.*; *Testimony of Stephen Nelson, M.D.* The failure to maintain an adequate oxygen supply sustained by N.E.D. caused the hypoxic brain injury. *Testimony of Alex Shermer, M.D.*; *Testimony of Stephen Nelson, M.D.* The hypoxic brain injury suffered by N.E.D. was caused, in its entirety, by the failure to keep N.E.D. properly oxygenated and monitored while she was intubated, *Testimony of Alex Shermer, M.D.*; *Testimony of Stephen Nelson, M.D,* and not due to any enhancement of any injury from the playground fall. *Plaintiffs' First Amended Complaint* [Doc. 51, ¶35]; *Testimony of Alex Shermer, M.D.*; *Testimony of Stephen Nelson, M.D; Testimony of Erin Bigler, Ph.D.; Lujan v. Healthsouth Rehabilitation,* 120 N.M. 422, 902 P.2d 1925 (1995).

## DAMAGES

Plaintiffs submit the following are damages issues in dispute:

1. What is the life expectancy of N.E.D.;

2. What is the value of the life care plan for N.E.D.;

3. What are the parental damages for Dominique Billy and Jacob Dotson;

4. Whether her medical bills proximately caused by Defendant are reasonable, necessary, and customary for New Mexico?

5. Does N.E.D.'s family members have loss of consortium claims;

6. Whether Defendant's requirement for an irrevocable reversionary trust is in N.E.D.'s best interest and is who best qualified to manage any Court award on her behalf?

## PRESENT CONDITION

On February 28, 2016, N.E.D. went from a vibrant and healthy six year old girl to a child with a permanent catastrophic global hypoxic brain injury. N.E.D. will never be able to live on her own and is incapable of ever becoming employed. *Testimony of Denise Taylor, M.D.; Testimony of Joan Schofield, RN, CLCP; Testimony of Erin Bigler, Ph.D.* N.E.D. functions at a level similar to a two-to-three-year old. All regions of N.E.D.'s brain have been affected including her behavior, motor language, visuospatial, intellectual, cognitive and emotional functions are at or below the 1st percentile as compared to children of similar age. *Id.*

N.E.D. is currently nine years old and requires diapers which are used for bowel and bladder management and has developed a penchant for taking off the diapers in public, flinging it, or playing with the feces in the diaper. T*estimony of Dominique Billy and Jacob Dotson; Testimony of Joan Schofield, R.N., CLCP*. She can self-feed at a level similar to an 18 month old such as putting finger food into her mouth. N.E.D will require close 24/7 one on one supervision by

qualified personnel for the remainder of her life. *Testimony of Denise Taylor, M.D.; Testimony of Erin Bigler, Ph.D.; Testimony of Stephen Nelson, M.D.; Testimony of Carrie Tingley Rehabilitation Medical personnel; Testimony of Joan Schofield, R.N., CLCP*

Dr. Denise Taylor's medical opinion to a reasonable medical certainty is that attending on-going therapy at least twice weekly takes precedence over N.E.D. starting school. *Testimony of Denise Taylor, M.D.* N.E.D. will require continued therapy through late adolescence and intermittently through adulthood. *Testimony of Denise Taylor, M.D.; Testimony of Joan Schofield, R.N., CLCP.* N.E.D. continues to be argumentative in any communication inasmuch as she is averbal. *Testimony of Denise Taylor, M.D.; Testimony of Joan Schofield, R.N., CLCP*

N.E.D. can now open doors and lacks any sense of safety awareness and is becoming physically aggressive as evidenced by biting, grabbing, scratching, and pulling hair, with a preference for biting. *Testimony of Dominique Billy and Jacob Dotson; Testimony of Joan Schofield, R.N., CLCP.* N.E.D. must be kept separated from her younger brother, S.D. *Testimony of Dominique Billy and Jacob Dotson; Testimony of Joan Schofield, R.N., CLCP.* Physical restraint is becoming increasingly difficult for the parents as N.E.D. is incredibly strong for her age. *Testimony of Dominique Billy and Jacob Dotson; Testimony of Joan Schofield, R.N., CLCP.* N.E.D. exhibits socially inappropriate behaviors, such as trying to run away in stores, does not respond when called, and does not understand social boundaries such as when she reaches into others' purses in public. *Testimony of Dominique Billy and Jacob Dotson; Testimony of Joan Schofield, R.N., CLCP.* Such behaviors are totally contrary to her life before the medical negligence at GIMC.

A.   **Life Expectancy**

The first damages issue in dispute is the life expectancy of N.E.D. Plaintiffs maintain that she will live another 72 years. N.E.D.'s life expectancy is directly correlated to the quality and types of care she receives over the course of her life. Defendant claims that N.E.D. will only live until she reaches 53 years of age predicated on her medical condition.  Based on this life expectancy disagreement, there is a difference in the value of the parties' life care plans. In addition, there is a dispute between the life care planners regarding the nature, types, and duration and quality of care N.E.D. is to receive over the course of her life.

N.E.D.'s life expectancy for a 9-year-old female is 72.6 years or to an age of 81. National Vital Statistics Reports, Vol. 67, No. 7, November 13, 2018, Table 3, Life tables for females, United States 2018; *Testimony of Denise Taylor, M.D.; Testimony of Erin Bigler, Ph.D.; Testimony of Stephen Nelson, M.D.; Testimony of Brian McDonald, Ph.D.; Testimony of Joan Schofield, R.N., CLCP.* The life expectancy of N.E.D. is directly dependent upon the quality of care she receives and the level of training of the 24/7 attendants. *Testimony of Denise Taylor, M.D.; Testimony of Erin Bigler, Ph.D.; Testimony of Stephen Nelson, M.D.; Testimony of Carrie Tingley Hospital Rehabilitation medical personnel.* With specialized care, supervision and guidance, and professional and comprehensive medical care for the balance of her life to address the unique combination of physical, emotional, and behavioral impairments that demand specialty in-home and/or adult brain injury residential services by licensed professional with related and job-skill training, N.E.D.'s life expectancy will be unaffected by her injuries.  *Testimony of Denise Taylor, M.D.; Testimony of Erin Bigler, Ph.D.*

It is important to note that Defendant's liability and damages experts (life care planner only) have not performed any independent medical examination, have not conducted any home visits

meeting with N.E.D. and her siblings, Dominque Billy and Jacob Dotson, and have not had any meetings with N.E.D.'s medical providers, including Dr. Denise Taylor (treating physician) and the therapists at the Carrie Tingley Hospital.

As a result, Plaintiffs' dispute the viability of Defendant's claim of a shortened life expectancy without making the effort to fully and comprehensively evaluate N.E.D. through an independent medical examination, interviewing her treating physicians and therapists, and conducting home interviews with her parents. In fact, Defendant relies on its expert, Dr. Richard Daschieff, a medical doctor who has no experience or specialization in pediatric care and pediatric neurology, to opine as to N.E.D.'s life expectancy. Dr. Daschieff did not perform an independent medical examination of N.E.D., failed to discuss the medical care and condition of N.E.D. with her treating physicians and therapists, and only relied on the medical records to reach the medical conclusion of N.E.D.'s shortened life expectancy.

### B.   Life Care Plans

The second damages issue in dispute is the value of the life care plans offered by the parties. Both parties will be calling nurse life care planners to testify. [Docs. 107, 108]. As noted above, Plaintiffs' will offer M. Brian McDonald, Ph.D., an economist who will support (in present value dollars) the cost of N.E.D.'s proposed life care plan. Defendant is not offering any economic testimony. The dispute between the parties in the presentation of the life care plans centers on the quality of care for the duration of N.E.D.'s lifetime, the kinds of care she is to receive and by whom, and her life expectancy which directly drives the quality of care to her projected age of 81. The present value of N.E.D.'s life care plan is $16,201,886 in 2018 dollars. *Testimony of Brian McDonald, Ph.D.; Testimony of Joan Schofield, R.N., CLCP.*

C. __Parental Damages__

The third damages item disputed is the payment for the care that Dominique Billy and Jacob Dotson have performed in the care of their daughter since N.E.D.'s injuries at GIMC on February 28, 2016, as well as the value of such care for the balance of their lives. Both Ms. Billy and Mr. Dotson will testify as to their specific claim for damages regarding their losses, including mileage to and from Gallup, New Mexico to Albuquerque; loss of income to Ms. Billy in having to terminate her employment to care full time for her daughter; and how such loss of income has burdened the family and required Mr. Dotson to work more hours to support his family. Such impact on their loss of income has taken him away from the home. Ms. Billy also makes a claim for the damages of such care based on the rate of hourly pay for her services both as a non-licensed medical provider and that of a licensed practical nurse. Dominque Billy would have earned $469,702 in 2018 present value dollars from February 28, 2016 though the year when N.E.D. turns age 21. *Testimony of Brian McDonald, Ph.D.; Testimony of Dominique Billy.* Plaintiffs Dominique Billy and Jacob Dotson have performed services after receiving training equaling that of medically trained medical personnel in the daily care of N.E.D., including changing feeding tubes, feeding, performing tasks at a higher lever comparable to nursing care. *Testimony of Denise Taylor, M.D., Testimony of Joan Schofield, R.N., CLCP; Testimony of Dominique Billy and Jacob Dotson.*

Plaintiff Dominique Billy's care during N.E.D.'s hospitalization as a non-licensed care giver is $35 per hour. *Testimony of Joan Schofield, R.N., CLCP.* Plaintiff Dominique Billy's care during N.E.D.'s discharge from UNMH is commensurate with a LPN at $45 per hour. *Testimony of Joan Schofield, R.N., CLCP.* Plaintiff Dominique Billy's mileage from August 3, 2016 projected through September 19, 2019 is $73,483.20. (280 miles per round trip from Gallup to Albuquerque

and round trip at $.54 a mile. *Testimony of Dominique Billy; Testimony of Joan Schofield, R.N., CLCP.* Plaintiff Dominique Billy's care for N.E.D. prior to UNMH discharge is $87,920.00. *Testimony of Dominique Billy.* Family's care post hospital to September 17, 2019 is approximately $1,224,720.00. *Testimony of Dominique Billy; Testimony of Joan Schofield, R.N., CLCP; Testimony of Brian McDonald, Ph.D.* Total value of care rendered by the family is calculated at approximately $1,386,123, which includes mileage to Albuquerque for out-patient care. *Testimony of Dominique Billy; Testimony of Joan Schofield, R.N., CLCP; Testimony of Brian McDonald, Ph.D.* Plaintiff

### D.      Medical Bills Are Reasonable, Necessary and Customary for New Mexico

N.E.D.'s medical bills arising from the Defendant's negligence are reasonable, necessary, and customary for New Mexico, and proximately caused by Defendant's negligence. *Testimony of Denise Taylor, M.D; UNMH fiscal and billing representatives.* N.E.D.'s medical bills as of January 15, 2019 are approximately $614,370.61 and accruing regularly at the University of New Mexico Hospital for N.E.D.'s required ongoing therapies. *Testimony of Denise Taylor, M.D.; Testimony of UNMH billing personnel; Testimony of UNMH therapists.* N.E.D.'s future medical needs are addressed in Plaintiffs' life care plan.

### E.      Loss of Consortium

N.E.D. and Plaintiffs enjoyed their lives with N.E.D. and with her family in their daily life experiences up until Defendant's negligence and N.E.D.'s hospitalization at GIMC on February 28, 2016. Each of N.E.D.'s family members, therefore, have a factual and legal claim to the loss of consortium to the love, friendship and guidance negligently taken by Defendant.

A loss of consortium claim is recognized in New Mexico in *Romero v. Byers*, 872 P.2d 840 (N.M. 1994), where the Supreme Court of New Mexico held that a loss of consortium claim is to

be brought separately from a wrongful death claim. *Id*. at 842. The *Romero* court defined loss of consortium as "the emotional distress suffered by one [spouse] who loses the normal company of his or her mate when the mate is physically injured due to the tortious conduct of another." *Id*. at 843.

There is a two-prong test to determine if damages for loss of consortium are warranted. *Holley v. Evangelical Lutheran Good Samaritan Society*, No. 12-CV-0320(KBM/WDS), 2012 WL 12902722, at *2 (D.N.M. June 8, 2012). The first prong requires proving a "sufficiently close relationship." *Id*.; *see also Grano v. Weese*, No. 17-CV-0287(SMV/KK), 2017 WL 3051952, at *4 (D.N.M. June 27, 2017). The second prong requires proving that there was a duty of care owed by the defendant to the claimant where it was foreseeable that the injury would harm the relationship. *Id*. (citing *Wachocki v. Bernalillo County Sheriff's Dept.*, 265 P.3d 701, 703 (N.M. 2011)).

With regard to the first prong, the factors to be considered in determining whether the relationship was sufficiently close include: the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and ... whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements. *Lozoya*, 66 P.3d at 957 (citation omitted). Of these factors, "mutual dependence is the key factor." *Holley*, 2012 WL 12902722 at 2. In turn, mutual dependence includes emotional, physical, and financial support, turning on a relationship that is "intimate, protective, interdependent, and intertwined in functional...financially interdependent, and temporal ways." *Fitzjerrel v. City of Gallup ex rel. Gallup Police* Dep't, 79 P.3d 836, 840 (N.M. Ct. App. 2003). The burden is on the claimant to prove a "close familial relationship with the victim." *Lozoya*, 66 P.3d at 957 (citing

*Fernandez*, 968 P.2d 774).  Analyzing the *Fernandez* decision, the *Wachocki* court noted that a small child "depends almost entirely on her primary caregiver to provide for her needs," and on the other hand, the caregiver is "largely consumed by the responsibility;" the obligation to the child is thus a "defining component" of the caretaker's life. *Wachocki*, 228 P.3d at 519.

Accordingly, N.E.D.'s siblings and parents have been permanently deprived of the loss of consortium of their sister and daughter for the balance of their lives.

### F.    Irrevocable Reversionary Trust

Should the Court make an award of money damages for Plaintiffs, how such funds are to be treated is a disputed damages issue. [Docs. 172, 178]. Defendant and the Department of Justice routinely insist that when in settling a Federal Tort Claims Act case (especially in regarding a minor), or when a judgment is entered, that the plaintiff has to agree to an irrevocable reversionary trust. Defendant's proposed reversionary trust utilizes an out of state administrator and trustee which adds bureaucratic layers to the day to day implementation of the care for N.E.D. Plaintiff opposes this imposition and has fully briefed the matter.  [Doc. 156, 162].

There is no need for the type of irrevocable reversionary trust proposed by Defendant. Notwithstanding the debate as to whether or not an irrevocable reversionary trust is in the best interests of N.E.D., Plaintiffs are mindful of the need for a local trustee and administrator to assist the family in managing the funds that the Court may award. Plaintiffs have established a suitable and reasonable approach to the United States' insistence on its type of trust.

Trusts managed by local trust companies, like New Mexico Bank and Trust, are subject to New Mexico law and court order. *Serrano Dec., ¶ 3*. The trust company submits annual accounting reports to the beneficiaries and their legal guardian(s) detailing the trust's income-producing activities and expenditures, and also responds to audits pursuant to state and federal law. *Hill v.*

28

*United States,* 81 F.3d 118, 121 (10th Cir. 1996); *Hull v. United States,* 53 F.3d 1125, 1128 (10th Cir. 1995); *Plaintiffs' Memorandum In Opposition to the Establishment of a Reversionary Trust [Doc. 156, 162]; Affidavit of Bank of New Mexico Trust officer, Camille Serrano, [Doc.156-2]; Declaration of Dennis Murphy [Doc. 156-4], Declaration  of Dan Pick [Doc. 156-3]; Hill v. United States,* 81 F.3d 118, 121 (10th Cir. 1996); *Hull v. United States*, 971 F.2d at 1505. A local trust in this case will be created expressly for N.E.D.'s benefit and will require some flexibility because her needs and medical conditions will undoubtedly change as she ages.  *Id.* The local trustee will call upon qualified medical and specialized professionals to assist in the evaluation of the beneficiary's medical needs, and to determine the most economical approach that balances the needs of the trust beneficiary and the preservation of funds.  *Id.* The local trustee will also assess what financial support is needed for medical services provided by family members, who often provide the superior care with a better outcome to the injured person than that provided by a more expensive commercial source.  *Id.*

When family members are part of the care team, they may be in the best position to provide day-to-day input to the local trust officers regarding the beneficiary's needs and condition.  *Id.* Finally, in making its determination as to the requirement of whether or not an irrevocable reversionary trust is needed, the Court should consider that family assistance in and monitoring their daughter's care often results in a loss of income to the family, which may require compensation to the family member for services which are in the best interests of their daughter. *Id.*

## CONCLUSION

Plaintiffs respectfully file this *Memorandum of Law* and state that the facts and law contained herein will be presented to the Court on September 17, 2019. Plaintiffs' additionally incorporate by reference their *Findings of Facts and Conclusions of Law* filed on August 1, 2019.

Respectfully submitted,

BARUDIN LAW FIRM, P.C.

*/s/ Theodore W. Barudin*
By:  Theodore W. Barudin
7900 Menaul Blvd NE
Albuquerque NM  87110
(505) 332-1800
tbarudin@barudinlaw.com

William H. Carpenter
WILLIAM H. CARPENTER LAW OFFICE
Post Office Box 35070
Albuquerque, NM 87176-5070
(505) 243-1336
 bill@carpenter-law.com

Ronald I. Kaplan, M.D., JD
KAPLAN &LUKOWSKI, LLP
333 Sandy Springs Circle,  Suite 200
Atlanta, Georgia 30328
(404)-845-0012
rik@kaplanlegal.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of August, 2019, I filed *Plaintiffs' Memorandum of Law* with Judge Richard Eaton, Chambers_of_Sr_Judge_Eaton@cit.uscourts.gov and served all parties and counsel with the foregoing pleading via CM/ECF system and electronic mail, as follows:

Erin Lagenwalter
Ruth F. Keegan
United States Attorney's Office

District of New Mexico
P.O. Box 607
Albuquerque, NM  87103
 (505) 346-7282
 Erin.Lagenwalter@usdoj.gov
 Ruth F.Keegan@usdoj.gov