IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DENNIS MURPHY, Guardian Ad Litem
for N.E.D., an incapacitated minor; JACOB DOTSON;
DOMINIQUE BILLY, individually and as next friend
of I.C. and S.D., minors,

      Plaintiffs,                               No. 1:17-cv-00384 JAP/JHR

vs.

THE UNITED STATES OF AMERICA,

      Defendant.

**MEMORANDUM OPINION AND ORDER**[***]

In its July 27, 2020 Findings of Fact and Conclusions of Law (Doc. 267) ("*Murphy I*"), this Court awarded damages for injuries to N.E.D., a minor child, resulting from Defendant's negligence. The Court's award, in substance, was $1,137,840.00 for past medical expenses,[1]

---

[*] Defendant filed the release by Plaintiffs of PlayPower Inc. (Confidential Doc. 219-1) and its brief in support of an offset (Confidential Doc. 256) under seal. The Court afforded the parties fourteen days to propose redactions to protect confidential information. *See* Sealed Memorandum Opinion and Order, filed January 27, 2021 (Confidential Doc. 275). On February 8, 2021, Plaintiffs' counsel asked that the dollar amount of Plaintiffs' settlement with PlayPower be redacted. In this public version, the Court has redacted all references to the dollar amount.

[**] Richard K. Eaton, Judge of the United States Court of International Trade, sitting by designation.

[1] This included $500,000.00 for past medical expenses, stipulated to by the parties prior to trial. (Doc. 216).

$14,219,657.00 for future medical expenses, and $600,000.00 for non-medical damages.[2] *Murphy I* at 15. Before the Court are two remaining issues concerning this award.

First, Defendant contends that it is entitled to an offset of the full amount of a settlement between Plaintiffs and PlayPower, Inc., a former defendant in a parallel state proceeding. For the reasons set forth below, the Court finds that Defendant is entitled to an offset of $600,000.00, which represents double recovery of non-medical damages covered by Plaintiffs' settlement with PlayPower.

Second, the parties disagree as to whether the trust protecting the award for future medical expenses should be reversionary in nature. That is, Defendant argues that, following N.E.D.'s death, any remaining principal should revert to the United States, rather than to N.E.D.'s estate. Subject to its instructions below, the Court directs that the award of future medical expenses, $14,219,657.00, be placed in a reversionary trust for the benefit of N.E.D., with any remaining principal after her death reverting to the United States.

## BACKGROUND[3]

On October 20, 2020, the Court held a closed oral argument on the issues of the potential offset and the type of trust in which the award for future medical expenses would be held.

---

[2] The New Mexico Medical Malpractice Act caps recovery of damages for non-medical expenses at $600,000.00. *See* N.M. STAT. ANN. § 41-5-6(A), (B) (1978), *amended by* 1992 N.M. Laws ch. 33.

[3] This opinion presumes familiarity with the facts and holdings set out in *Murphy I*.

I. **Settlement with Former State Court Defendant PlayPower**

In February 2016, N.E.D. fell from playground equipment manufactured by PlayPower. Her father, Plaintiff Jacob Dotson, took her to the Gallup Indian Medical Center, where Defendant's negligence caused her to suffer an anoxic brain injury resulting in permanent and profound disability. On behalf of N.E.D., Plaintiffs brought suit in federal court against the United States under the Federal Tort Claims Act ("FTCA"), and in state court against PlayPower and the City of Gallup for common law tort claims of negligence, negligence *per se*, willfulness or recklessness of suppliers, and strict product liability. (Doc. 99-1.) Thereafter, Plaintiffs and PlayPower reached a confidential settlement. The amount of the PlayPower settlement was ███████████.

The release by Plaintiffs of PlayPower (the "Release") (Confidential Doc. 219-1), provides that it is only for non-medical damages.[4] *See* Pls.' Post-Trial Mem. Opp. Gov't's Offset Claim (Doc. 252) (Jan. 31, 2020) ("Pls.' Br. Re: Offset") 7.

At the close of trial, the Court ordered that Plaintiffs' settlement with PlayPower, the accompanying release, and the Guardian Ad Litem report, be placed under seal on the record. (Doc. 266.) The parties submitted post-trial briefing regarding the United States' claimed offset of the total settlement amount against Plaintiffs' recovery.

---

[4] "[N]o portion of [the settlement] represent[s] payments for past medical damages, future medical damages, any medical related expenses, prejudgment interest, post judgment interest, exemplary damages or punitive damages." Release at 3.

## II.    Reversionary Trust

The parties agree that the damages award for future medical expenses should be placed in trust for the benefit of N.E.D. The parties further agree that a New Mexico trust company, such as the New Mexico Bank & Trust, may act as trustee.

The parties disagree, however, as to what type of trust is appropriate. Plaintiffs argue that any unused trust principal should revert to N.E.D.'s estate in the event of her death. Defendant contends that a "reversionary trust" is warranted, where any unused principal reverts to the United States upon N.E.D.'s death. In support of its position, Defendant provided a sample trust instrument with its pre-trial briefing, outlining a reversionary trust by the terms of which the New Mexico Bank & Trust would act as trustee, and MediBill, Inc., a California company, would act as "administrator." (Doc. 159-1.)

## LEGAL FRAMEWORK

Settlement agreements are contracts, and New Mexico courts interpret them according to contract principles. "A court is bound by the unambiguous language of a settlement agreement." *Russell v. Russell*, 1990-NMCA-080, ¶ 8, 111 N.M. 23, 26, 801 P.2d 93, 96.

In cases involving two successive tortfeasors, New Mexico law accounts for the possibility that a plaintiff may settle with one tortfeasor but not the other and, in so doing, recover damages for a portion of its injuries that may not later be recovered a second time. *See Lujan v. Healthsouth Rehab. Corp.*, 1995-NMSC-057 ¶¶ 26-27, 120 N.M. 422, 429, 902 P.2d 1025, 1032 (emphasis added) ("[The plaintiff has] the burden to show what portion of the . . . *settlement obtained from [one tortfeasor] reasonably is attributable to the original injury. Absent evidence affirmatively establishing such an amount, the entire [settlement] must be set off against any judgment obtained*

*against [the successive tortfeasor]*."). That is, if the settlement or accompanying release does not specify what damages the plaintiff has foregone in exchange for the settling tortfeasor's payment, the plaintiff bears the burden of showing that any damages it may obtain against the non-settling tortfeasor have not already been recovered. *See id.* (citing *Sanchez v. Clayton*, 117 N.M. 761, 768, 877 P.2d 567, 574 (N.M. 1994)).

In the context of the FTCA, tort plaintiffs suing the United States are barred from repeatedly seeking payment of damages from the United States for the same injury. *See, e.g.*, *Hull by Hull v. United States*, 971 F.2d 1499, 1505 (10th Cir. 1992) ("[C]ourts cannot subject the government to ongoing obligations like . . . continuing payments . . . ."). The New Mexico Medical Malpractice Act bars the payment of a lump sum for future medical expenses. *See* N.M. STAT. ANN. § 41-5-7(D) (1978), *amended by* 1992 N.M. Laws ch. 33 (emphasis added) ("Payment for medical care and related benefits shall be made *as expenses are incurred*."). In circumstances such as these, the Tenth Circuit authorizes district courts in FTCA cases to fashion remedies, including reversionary trusts, by which periodic payments can be made to injured parties after the United States has discharged its one-time obligation. *See Hull*, 971 F.2d at 1505.

### DISCUSSION

**I.     The United States Is Entitled to an Offset of $600,000.00 of the Award for Non-Medical Damages**

The issue of whether Defendant is entitled to an offset depends on what damages were covered by the Court's award (set out in *Murphy I*), and by the settlement between Plaintiffs and PlayPower.

Plaintiffs characterize the settlement with PlayPower as one that covers *only* non-medical damages, whether caused by PlayPower's allegedly tortious conduct or by Defendant's

malpractice in this case. *See* Pls.' Br. Re: Offset 7 ("Recognizing that Plaintiffs would be entitled to pursue their claims against the Government for a full recovery for medical and related expenses from the anoxic injury, Plaintiffs and PlayPower agreed to limit the PlayPower Settlement to non-medical damages."). In other words, Plaintiffs contend that there is no double recovery because the damages recovered from the United States are primarily *medical* damages,[5] and the ▉▉▉▉▉ recovered from PlayPower is only for *non-medical* damages.

Plaintiffs base this argument on the language of the Release itself.[6] *See* Release at 3; Pls.' Br. Re: Offset 7-8. Plaintiffs also argue that there is no reason to question the settlement, outside the language of the Release, because ▉▉▉▉▉ is reasonable compensation "for the non-medical damages resulting from the permanent and irreversible catastrophic brain injury suffered by [N.E.D.]." Pls.' Br. Re: Offset 9-10.[7]

---

[5]   Plaintiffs recovered $600,000.00 in non-medical damages from the United States. However, the primary award of $15,357,497.00 is for past and future medical expenses. Specifically, the Court awarded $14,219,657.00 for "future medical expenses." Prior to trial, the parties stipulated to past medical damages (Doc. 216) in the amount of $500,000.00, and Plaintiff Dominique Billy was additionally compensated for her medically related care of N.E.D. in the amount of $637,840.00. *See Murphy I* at 15.

[6]   "[N]o portion of [the settlement] represent[s] payments for past medical damages, future medical damages, any medical related expenses, prejudgment interest, post judgment interest, exemplary damages or punitive damages." Release at 3.

[7]   Although the *Murphy I* award for non-medical damages against Defendant in this case was capped at $600,000.00 under the New Mexico Medical Malpractice Act, that cap has no bearing on what Plaintiffs could have recovered for medical or non-medical damages in a personal injury suit against PlayPower, because Plaintiffs sued PlayPower for negligence and strict liability, (Doc. 99-1), not medical malpractice. *See* N.M. STAT. ANN. § 41-5-6(A), (B).

In addition, in the Release, PlayPower agreed to assign certain rights of indemnity to Plaintiff.[8] *See* Release at 4. In their briefing and at oral argument, Plaintiffs have stated that they intend to pursue an indemnification claim against the United States, only if an offset is granted by the Court. *See* Pls.' Br. Re: Offset 8 ("[I]f the Government were successful in its claim for a full offset against the total amount of the PlayPower Settlement, PlayPower would have a viable claim for indemnity. Plaintiffs recognized the potential value of such an indemnity claim and, consequently, included the assignment of PlayPower's right to indemnity in the Release as additional protection for Plaintiffs.").

Defendant claims that an offset is warranted on two primary grounds.[9] *See* Def.'s Sealed Br. Support Offset (Confidential Doc. 256) (Jan. 31, 2020) ("Def.'s Br. Re: Offset") 7-10. First, Defendant argues that, in accordance with *Lujan*, Plaintiffs have not adequately carried their burden of showing how much, if any, of the settlement amount is attributable to the injury allegedly caused by PlayPower, as distinct from the injuries proven against the United States. *See* Def.'s Br. Re: Offset 11 (citations omitted) ("In *Lujan*, the only contemplated apportionment of a settlement is between the original injury and the enhanced injury. . . . The subject Settlement Agreement made no such apportionment. . . . Absent evidence affirmatively establishing the amount attributable to

---

[8] PlayPower agreed to "assign to the Plaintiffs all claims for indemnification and/or contribution they may have against the City of Gallup or the United States government, as concurrent or joint tortfeasors." Release at 4.

[9] Additionally, Defendant appears to take issue with Plaintiffs' "characterization" of the PlayPower settlement as covering only non-medical damages because (1) the proceeds have been used for medically-related expenses, and (2) because the PlayPower defendants were released from *all* liability, both for medical and non-medical damages. Defendant does not support this argument with any legal authority, however. Def.'s Br. Re: Offset 10. It bears noting that neither the eventual use of the settlement money, nor the consideration PlayPower received for settling, bears on the nature of damages covered by the settlement.

the original injury, the entire settlement amount must be set off against any judgment obtained against the successive tortfeasor.").

Second, Defendant argues that the settlement does not effectively protect the United States from double recovery. Defendant specifically points to the "assignment" by PlayPower to Plaintiffs of PlayPower's right to seek indemnification against the United States:

> There is nothing that stops the PlayPower Defendants (or Plaintiffs, if the assignment is valid) from seeking recoupment of the Settlement Amount from the United States. Both the PlayPower Defendants, by filing a notice of claim, and, after receiving the assignment, Plaintiffs have threatened the United States that they intend to seek indemnification for the full Settlement Amount. Indeed, Plaintiffs acknowledge the United States' double exposure by taking an assignment of the indemnification claim. If Plaintiffs believed that neither Plaintiffs nor the PlayPower Defendants could recover for the Settlement Amount against the United States purportedly because the Settlement Amount covered only medical expenses, they would have negotiated a full release of the indemnification claim. Instead, they took an assignment for it.

Def.'s Br. Re: Offset 11.

### A. The Settlement Amount Is Reasonable Because of the Extent of N.E.D.'s Non-Medical Damages

As a threshold matter, the Court finds that, for purposes of deciding the issue of offset, the amount of the settlement— ▮▮▮▮▮▮ —is not so great as to compel a finding that it was intended to cover medical as well as non-medical damages. In other words, the settlement amount is reasonable, given the severity of N.E.D.'s injuries and the non-medical damages she and her parents suffered as a result. *See Murphy I* at 7. The award for non-medical damages against Defendant in this case was capped at $600,000.00 under the New Mexico Medical Malpractice Act, but the application of the cap has no bearing on what Plaintiffs could potentially recover for medical or non-medical damages in a personal injury suit outside the medical malpractice context. N.M. STAT. ANN. § 41-5-6(A). Thus, the $600,000.00 cap would not have applied to any award

obtained against PlayPower, because Plaintiffs sued PlayPower for negligence and strict liability, not medical malpractice. (Doc. 99-1.)

The Court has previously found that N.E.D. and her parents suffered extensive non-economic loss. First, it found that N.E.D.'s injury has severely impaired her cognitive, emotional, social, and physical abilities. *See Murphy I* at 5. It also found that N.E.D.'s parents suffered significant and permanent losses in their relationship with N.E.D. as a consequence of her injuries. *Id.* at 7. Finally, contrary to Defendant's position at trial that N.E.D.'s expected lifespan was 53 years, the Court found that N.E.D.'s expected lifespan was 81 years, which necessarily increased the duration of medical and non-medical damages. *Id.* at 8.

Moreover, as Plaintiffs point out in their brief, PlayPower may well have considered that recent New Mexico personal injury cases have resulted in jury awards for non-medical damages far exceeding the amount, ████████, it paid here. *See, e.g.*, *Morga v. Fedex Ground Package Sys., Inc.*, 2018-NMCA-039 ¶¶ 18, 26, 420 P.3d 586, 594-96, *cert. granted*, June 4, 2018 (upholding a jury award of $32,000,000 in damages to a child who suffered numerous traumatic injuries in a vehicle accent, even though the evidence showed that his medical treatment amounted to less than $500,000, because "a jury is given wide latitude in fixing the amount of . . . awards [for non-economic damages such as pain and suffering]"). Thus, there is no reason to believe that Plaintiffs' settlement with PlayPower was for anything other than it purports to be—*i.e.*, a settlement with respect to non-medical damages only.

  **B.**  **Plaintiffs Have Carried Their Burden as to Double Recovery**

    **1.**  **There Is No Double Recovery as to the *Murphy I* Award for Medical Damages**

The New Mexico Supreme Court has held, in *Lujan* and *Sanchez*, that a plaintiff who settles with the intent of obtaining an additional award of damages through litigation "has an obligation

to establish what compensatory damages he is foregoing in the settlement." *See Lujan*, 1995-NMSC-0571 ¶ 27, 120 N.M. at 429, 902 P.2d at 1032 (quoting *Sanchez*, 117 N.M. at 768, 877 P.2d at 574). In *Lujan*, which involved a settlement with the first but not the successive tortfeasor, the Court held that an offset was warranted where the plaintiff had failed, in the language of the release or otherwise, to indicate what portion of the damages compensated by settlement were attributable to the original versus the enhanced injury. *See Lujan*, 1995-NMSC-0571 ¶ 27, 120 N.M. at 429, 902 P.2d at 1032 ("There is no specification in the Lujan release as to how the consideration paid by [the first tortfeasor] is to be divided between the original injury . . . and the enhanced injury."). *Sanchez*, on which *Lujan* relied, held that the "[p]roportion of compensatory damages not paid in settlement may be recovered." *Sanchez*, 117 N.M. at 768, 877 P.2d at 574.

Neither *Lujan* nor *Sanchez*, however, address Plaintiffs' precise situation, where damages were allocated according to type: "medical" (sought only against the United States) and "non-medical" (covered by the PlayPower settlement). Rather, the cases involved apportionment between the "original injury" and a later injury, in *Lujan*, and of compensatory damages generally, in *Sanchez*. *See Lujan*, 1995-NMSC-0571 ¶ 27, 120 N.M. at 429, 902 P.2d at 1032; *Sanchez*, 117 N.M. at 768, 877 P.2d at 574. Here, the Court must determine whether a release that explicitly stated the type of damages that were covered *and* what type of damages were excluded, sufficiently demonstrates that there has been no double recovery by Plaintiffs, and thus there is no entitlement to an offset.

Settlement agreements are contracts, and New Mexico courts construe them in accordance with contract principles. "A court is bound by the unambiguous language of a settlement agreement." *Russell*, 1990-NMCA-080, ¶ 8, 111 N.M. at 26, 801 P.2d at 96; *see also In re Otero Cnty. Hosp. Ass'n, Inc.*, 571 B.R. 854, 861 (Bankr. D.N.M. 2017), *on reconsideration in part*, 585

B.R. 161 (Bankr. D.N.M. 2018) (citing *Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1172 (10th Cir. 2013)) ("Because a settlement agreement is a form of contract, the Court applies general principles of contract interpretation under state law to determine the meaning of a settlement agreement.").

Here, as a threshold matter, the Court finds the language of the Release to be unambiguous. *See* Release at 3 ("[N]o portion of [the settlement] represent[s] payments for past medical damages, future medical damages, any medical related expenses, prejudgment interest, post judgment interest, exemplary damages or punitive damages."). Because the settlement agreement provides that it covered only a type of injury not found (for the most part) in the case against Defendant, *Lujan's* prohibition against double recovery is inapplicable. *Lujan* does not work to prevent Plaintiffs from fully recovering both medical and non-medical damages. Accordingly, it is possible to effectuate the settling parties' intent without violating *Lujan*, and Defendant is not entitled to an offset as to the $15,357,497.00 award in *Murphy I* for medical damages, because the PlayPower settlement clearly excluded medical damages.

This finding is consistent with other New Mexico precedents where both state and federal courts have considered the types of damages or other compensation unambiguously covered by a settlement, when determining whether an offset is warranted against future recovery. *See, e.g.*, *Sanchez*, 117 N.M. at 768, 877 P.2d at 574; *Summit Properties, Inc. v. Pub. Serv. Co. of New Mexico*, 2005-NMCA-090, ¶ 50, 138 N.M. 208, 223, 118 P.3d 716, 731 (finding, in a contract case, that an offset or "credit" *was* warranted because the settlement at issue had been characterized as for "attorney fees" where there was, in fact, "no legal right to those fees"); *see also Otero*, 571 B.R. at 862 ("[T]he intended meaning of the language used in the Settlement Agreement . . . is clear: claims are released if *not covered* by and to the extent damages are not payable under any

available insurance; unreleased claims are claims that *are covered* by available insurance to the extent the type of damages that may be awarded on the claims are the type of damages payable under insurance."). Moreover, as has been noted, the evidence at the trial demonstrated that the amount of the settlement was consistent with the amount of non-medical injury.

Thus, with one limited exception, this Court finds that the settlement agreement and the Court's award in *Murphy I* compensate Plaintiffs for distinct types of damages, and no double recovery has occurred. Unlike the release at issue in *Lujan*, Plaintiffs' Release of PlayPower specifically divided these damages so that there would be no ambiguity about what the settlement covered and what it did not. The settlement covered non-medical damages up to ▮▮▮▮▮. The Court's award set forth in *Murphy I*, covered medical and medically-related damages in the total amount of $15,357,497.00, with an additional $600,000.00 award for non-medical damages.

Nothing prevents Plaintiffs from using settlement and litigation to maximize their potential recovery. *See, e.g.*, *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 47, 123 N.M. 752, 764, 945 P.2d 970, 982 ("Nothing prevents the allocation of damages so as to provide maximum protection for the insured."). Here, Plaintiffs could only recover $600,000.00 in non-medical damages from Defendant because of the state statutory cap, and thus they settled for an amount that reflected a reasonable approximation of their non-medical losses. Because no cap applied to their suit for medical damages against Defendant, Plaintiffs chose to forgo those damages in their settlement, and instead bring their medical malpractice claims to trial.

2.   **Defendants Are Entitled to an Offset of $600,000.00**

The Court next finds that Plaintiffs have not carried their burden with respect to the $600,000.00 award for non-medical damages, also set forth in *Murphy I*. Plaintiffs argue in their brief that the non-medical damages in this case exceed the ▮▮▮▮▮ settlement with

PlayPower, due to the severity of N.E.D.'s injuries. *See* Pls.' Br. Re: Offset 11 ("N.E.D. must suffer [profound difficulties] each and every day, . . . which will continue to plague her throughout her life. . . . [H]er injuries [have also had a destructive impact] on her extremely limited capacity in the future to enjoy life in any meaningful way. . . . Thus, N.E.D. faces not only a lifetime of struggle ahead, but of ongoing losses – the loss of the enjoyment of life on a daily basis.").

In their briefing and at oral argument, however, Plaintiffs failed to establish, based on the evidence on the record, which *non-medical* damages were definitively covered by the settlement and Release, and which were the subject of the suit against the United States. *See* Release at 3 ("All amounts received under the terms of this Release are for damages on account of personal physical injuries or sickness . . . ."); *see also Murphy I* at 7 (awarding non-medical damages). Under *Lujan*, "[a]bsent evidence affirmatively establishing [what damages are attributable to what injury], the entire [settlement amount] must be set off against any judgment obtained against" Defendant. *Lujan*, 1995-NMSC-0571 ¶ 27, 120 N.M. at 429, 902 P.2d at 1032. Plaintiffs cannot recover for the same non-medical damages twice. Thus, to avoid double recovery against Defendant in this case, the Court orders that $600,000.00 be offset against the judgment in *Murphy I*.

    **C.**    **The "Assignment" of PlayPower's Indemnification Rights to Plaintiffs Does Not Direct a Different Result**

Defendant argues that the settlement with PlayPower creates a risk of double recovery by Plaintiffs no matter how they characterize the damages it covers. Defendant maintains that Plaintiffs intend to treat the settlement in two ways: for non-medical damages only for the purposes of preventing offset, while simultaneously asserting that PlayPower, through the settlement, has paid medical damages attributable to the United States. Defendant argues:

> Plaintiffs' characterization of the Settlement Amount is of no consequence. . . . The United States remains subject to paying twice for the same injuries. There is nothing that stops the PlayPower Defendants (or Plaintiffs, if the assignment is valid) from seeking recoupment of the Settlement Amount from the United States. Both the PlayPower Defendants, by filing a notice of claim, and, after receiving the assignment, Plaintiffs have threatened the United States that they intend to seek indemnification for the full Settlement Amount. Indeed, Plaintiffs acknowledge the United States' double exposure by taking an assignment of the indemnification claim. If Plaintiffs believed that neither Plaintiffs nor the PlayPower Defendants could recover for the Settlement Amount against the United States purportedly because the Settlement Amount covered only [non-]medical expenses, they would have negotiated a full release of the indemnification claim. Instead, they took an assignment for it.

Def.'s Br. Re: Offset 10-11. In other words, Defendants believe that Plaintiffs will not be satisfied with the settlement against PlayPower and the Court's prior award, but that they will try to recoup the settlement amount a second time by suing the United States for indemnification pursuant to their assignment from PlayPower.

Plaintiffs, on the other hand, have represented that they will only seek to pursue indemnification if the Court offsets the settlement against the prior award. *See* Pls.' Resp. Gov't's Br. Supp. Offset PlayPower Settlement (Doc. 260) (Feb. 28, 2020) 7 ("That assignment was obtained only to protect Plaintiffs' right to recover fully for both the *medical* and *non-medical* damages they suffered. Therefore, if the Government is held responsible for all the *medical* damages caused by its medical facility, that, together with the PlayPower settlement for the major portion of the *non-medical* damages suffered by Plaintiffs, would obviate any need for invoking that assignment.").

The validity of the assignment to Plaintiffs is not presently before the Court—and nor is any action for indemnification. The Court observes, however, that the New Mexico Court of Appeals has invalidated assignments, such as the one at issue here, under the New Mexico Medical Malpractice Act. Any action for indemnification by Plaintiffs would be governed by the New Mexico Medical Malpractice Act, since the "gravamen" of such an action is necessarily

Defendant's medical malpractice. *See Christus St. Vincent Reg'l Med. Ctr. v. Duarte-Afara*, 2011-NMCA-112, ¶ 15, 267 P.3d 70, 74 ("[Because] the gravamen of Medical Center's equitable indemnification claim is predicated upon the allegation that Doctors negligently caused, and were partly liable for, [Plaintiff's] injuries. . . . [W]e hold that Medical Center's equitable indemnification claim is a malpractice claim as that term is used in the [Medical Malpractice Act] and is, therefore, subject to [the Act]."). That is, "[t]he controlling inquiry in determining whether a claim [including an indemnification claim] constitutes a 'malpractice claim' under the [Act] is merely whether the gravamen of the claim is predicated upon the allegation of professional negligence." *Id.* 2011-NMCA-112, ¶ 18, 267 P.3d at 74.

Where the gravamen of any action brought against Defendant would be for medical malpractice (there could be no serious claim that Plaintiffs could argue for damages under any other theory), then the Act applies, and would bar assignment of claims pursuant to it. *See* N.M. STAT. ANN. § 41-5-12 ("A patient's claim for compensation under the Medical Malpractice Act is not assignable.").

Thus, based on the "gravamen" rule, PlayPower's assignment of its indemnification claim to Plaintiffs would not result in Defendant being required to pay, because the PlayPower assignment of any right to contribution would be based on Defendant's medical malpractice. *See Leger v. Leger*, 2019-NMCA-033, ¶ 40, 444 P.3d 1036, 1048, *cert. granted* Apr. 8, 2019 (emphasis added) (citations omitted) ("[T]he Legislature intended the [Act's] requirements and restrictions to apply to all 'malpractice claims' covered by the [Act] (which the indemnification claim at issue undisputedly is) and, accordingly, that Section 41-5-12 bars assignment of all 'malpractice claims' for compensation covered by the [Act]."). Therefore, it appears that the assignment and any later

lawsuit for indemnification cannot accomplish what the statute forbids, and Defendant is not at risk of being found liable for any amount of non-medical damages in excess of $600,000.00.

**II.     The Damages for Future Medical Expenses Will Be Placed in a Reversionary Trust**

The parties disagree as to whether the trust for the future medical expenses award ($14,219,657.00) should be reversionary in nature. That is, whether any principal remaining after N.E.D.'s death should revert to Plaintiffs or to Defendant the United States. Both prior to and post-trial, the parties submitted briefing on this issue.

Plaintiffs argue that the applicable standard, under Tenth Circuit law, is whether a reversionary trust is in N.E.D.'s "best interests." *See* Pls.' Mem. Opp. Establishment Reversionary Tr. (Doc. 156) (Mar. 8, 2019) 2 (citing *Hull by Hull v. United States*, 53 F.3d 1125, 1128 (10th Cir. 1995) for the proposition that "the district court [must] focus only on what is in the plaintiff's best interest"); *see also* Pls.' Resp. Def.'s Br. Supp. Establishment Reversionary Tr. (Doc. 259) (Feb. 28, 2020) 4 ("Defendant's proposed reversionary trust is designed to benefit the Government, not N.E.D., the injured party.").

Defendant argues that the test is not the best interests of the injured party, but rather, that the district court is obliged to fashion a remedy approximating the applicable state statute as closely as possible. Defendants contend that by approximating the state statute, the United States is held liable under the FTCA only "in the same manner and to the same extent as a private individual under like circumstances" as required by 28 U.S.C. § 2674. *See* Def.'s Br. Supp. Establishment Reversionary Tr. (Doc. 257) (Jan. 31, 2020) ("Def.'s Br. Re: Reversionary Tr.") 7 (citations omitted) ("The Tenth Circuit applied the 'best interests' standard only to situations where state law did not require courts to structure certain damages in the form of periodic payments that would cease upon the plaintiff's death."). Defendant further argues that even if the standard *is* the best

interests of N.E.D., that a reversionary trust acts as a preventive measure to any mishandling of the funds during her lifetime. Def.'s Br. Re: Reversionary Tr. 11 ("Placing the funds in a reversionary trust removes any possibility that her parents or siblings would misuse the funds – intentionally or unintentionally – for non-medical expenses.").

For the reasons below, the Court finds that a reversionary trust is warranted.

### A. A Reversionary Trust Most Closely Approximates the New Mexico Medical Malpractice Act

As a threshold matter, the Court finds that Plaintiffs' representation of the "best interests" rule is misplaced. It is true that the Tenth Circuit has applied a best interests standard in personal injury and medical malpractice FTCA cases involving the potential for a reversionary trust. *See, e.g.*, *Hull*, 971 F.2d at 1505 ("[W]e hold that the district court has the inherent authority to order that [the child's] damages be paid in the form of a fully reversionary trust if it concludes that is in [the child's] best interest, so long as the government's obligation . . . ceases when it pays a fixed lump sum to fund that trust. In determining whether such a trust is appropriate on remand, the court should consider what form or structure of damages best serves [the child's] interests from [the child's] perspective only.").

Two Tenth Circuit precedents interpreting the FTCA, however, guide this Court's analysis regarding the applicability of the "best interests" test when determining whether a reversionary trust is appropriate: *Hill v. United States* and *Stokes v. United States*.

In *Hill*, the Tenth Circuit held that the district court could "create a reversionary trust that would approximate the result contemplated by [the relevant state law, the Colorado Health Care Availability Act]." *Hill v. United States*, 81 F.3d 118, 121 (10th Cir. 1996). There, although the Court applied the best interests test to a portion of damages unrelated to medical expenses, it did *not* apply the best interests test to "future medical expenses," because, "[u]nder the HCAA, an

award for future medical expenses would not accrue to the plaintiff's heirs upon his or her death." *Id.* Thus, because the relevant state law barred the continuation of medical payments following the injured party's death, the Court ruled that the United States "should receive a reversionary interest in that part of [the] award which covers future medical expenses." *Id.*

In *Stokes*, applying Oklahoma law, the Court again emphasized the need to "hold the government liable for tort claims 'in the same manner and to the same extent as a private individual under like circumstances,'" specifically in the context of applying "periodic payment" state statutes. *See Stokes v. United States*, 967 F.3d 1034, 1037-38 (10th Cir. 2020) (citations omitted). The *Stokes* Court addressed the limitations of the "best interests" standard from *Hull* and *Hill*:

> Thus, in *Hull*, the fact that future-care awards may be structured in the victim's best interest was not displaced by state law, like it is here. *Hill* similarly does not indicate that the victim's best interests supersedes the FTCA's requirement to approximate state statutes. True, in *Hill*, we considered the victim's best interests in declining to exercise our inherent authority to order the district court to grant the government a reversionary interest in the victim's future-earnings award. *Hill*, 81 F.3d at 121. But the state periodic-payment statute at issue in *Hill* did not permit reversion of future-earnings awards, so there was no conflict between our decision and the FTCA's requirement to approximate state statutes. *Id.* Thus, like *Hull*, *Hill does not give courts permission to deviate from the FTCA's approximation requirement, even if doing so is in the best interests of the victim*. Accordingly, we decline to deviate from this requirement here

*Id.* at 1042 (emphasis added).

The relevant state law here—the New Mexico Medical Malpractice Act—mandates that "[p]ayment for medical care and related benefits shall be made *as expenses are incurred*." *See* N.M. STAT. ANN. § 41-5-7(D) (emphasis added). As noted, the FTCA directs that the United States can only pay damages in a lump sum. *Hull*, 971 F.2d at 1504-05 (citing 28 U.S.C. § 1346). In order to reconcile the two legal requirements and the injunction to approximate state law, courts have used reversionary trusts. *See, e.g.*, *Hill*, 81 F.3d at 121. Applying the principle recently summarized in *Stokes*, the Court finds that a reversionary trust is the most appropriate way to satisfy this state

statute, while also conforming to the limited liability waiver contained in the FTCA, 28 U.S.C. § 2674. In other words, a reversionary trust is appropriate because it permits N.E.D. to obtain coverage for her future medical needs as they arise, but does not extend the benefits of the trust past the point of her death, after which no new expenses would be "incurred." Moreover, a reversionary trust will ensure that the United States meets its responsibilities, but is not required to pay for more than the medical expenses paid for the benefit of N.E.D. during her lifetime.

### B. Modifications to Defendant's Trust Are Appropriate

The Court directs that the award for future medical expenses be placed in trust with the New Mexico Bank & Trust, or other mutually agreed-upon entity, acting as trustee. To this end, the Court directs that the parties meet and confer as to the appropriate terms to be contained in the trust.

The parties may, but need not, use the sample trust provided by Defendant in formulating a trust that benefits N.E.D. by providing for her medical and medically-related expenses during her lifetime. The parties' trust need not contain any specific term from the sample trust. Specifically, the Court does not mandate the appointment of an out-of-state administrator because Defendant has provided no convincing reason for one. As is required by the New Mexico Medical Malpractice Act, N.E.D.'s medical expenses should be paid only as incurred, and since no medical expenses for N.E.D.'s benefit can be incurred after her death, any remaining principal shall then revert to the United States.

## CONCLUSION AND ORDER

It is therefore

**ORDERED** that the Plaintiffs' total damages awarded in *Murphy I* be offset by $600,000.00 to prevent double recovery of non-medical damages; and it is further

**ORDERED** that Plaintiffs' award for future medical expenses shall be placed in trust in a manner consistent with instructions of the Court contained herein.

          /s/ Richard K. Eaton
          Richard K. Eaton, Judge

Dated: February 12, 2021